FIRST NATIONAL BANK OF MINNE-APOLIS, a National Banking Association, Appellant,

v.

FIDELITY NATIONAL TITLE INSUR-ANCE COMPANY, a Nebraska Corporation, Appellee.

No. 77–1119.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1977.

Decided March 1, 1978.

---

**156**

Frank F. Pospishil, Abrahams, Kaslow & Cassman, Omaha, Neb., for appellant.

Robert J. Becker, Swarr, May, Smith & Andersen, Omaha, Neb., for appellee.

Before BRIGHT, WEBSTER,* and HEN-LEY, Circuit Judges.

BRIGHT, Circuit Judge.

This litigation commenced after the collapse of a complicated scheme to develop a parcel of real estate. Defendant-appellee Fidelity National Title Insurance Company was the title insurer of the development land, and plaintiff-appellant First National Bank of Minneapolis was the short-term development lender. Their dispute is over who shall bear the monetary losses caused by encumbrances of record that are prior in right to First National's mortgage. First National contends that Fidelity Title insured it as a first lienholder of the land and therefore seeks a declaratory judgment that Fidelity Title is liable under its policy to protect the Bank against the superior liens. After holding a hearing on the parties' cross-motions for summary judgment, the district court entered judgment for defendant Fidelity Title on January 10, 1977. Because it appears to us that disputed issues of fact exist that bear on liability, we reverse and remand the case for trial on the merits.

I.

Winchester Heights is a 348-lot subdivision located in the northwest part of Omaha, Nebraska. In 1973, Dial Investment, Inc. possessed purchase options for the property, which the Klinker family then owned. The parties had agreed upon a purchase price of $226,000.

On September 5, 1973, after several months of negotiations, Jack Karnes, president of Dial Realty, Inc. (a sister company of Dial Investment, Inc.), obtained a commitment for permanent financing of the

* Judge Webster concurred in this opinion prior to leaving this court to become Director of the Federal Bureau of Investigation.

Winchester Heights development from the Ford Motor Credit Company. Karnes was assisted in the negotiations by the Heitman Mortgage Company, a mortgage brokerage firm.

The commitment for permanent financing was contingent upon the completion of certain improvements at Winchester Heights, consisting primarily of site grading, installation of sewer and water lines, and construction of streets. To finance the improvements an interim loan was necessary, and Heitman contacted First National. In a letter dated September 27, 1973, First National agreed to make the necessary interim loan, contingent on agreement between the parties on the form and substance of necessary loan documents.

In October 1973, representatives of First National, Heitman, Dial Realty, and Dial Investment met to discuss the details of the interim construction loan. At this meeting, Jack Karnes, representing both Dial Investment and Dial Realty, proposed that the interim construction loan "wrap-around"[1] a purchase money mortgage on real estate. Apparently the Klinkers, owners of Winchester Heights, had consented to finance Dial Investment's purchase of the property by accepting three purchase money mortgages for the full sale price of the real estate ($226,000). These purchase money mortgages had an interest rate of 7%, considerably lower than the rate demanded by First National (3½% over prime, or about 15%). Accordingly, Karnes hoped to save money for his two companies, Dial Investment and Dial Realty, by persuading First National to "wrap" its loan "around" the first and superior mortgages to be held by the Klinkers rather than proceeding in the "normal" fashion of using interim loan proceeds to pay off immediately the superior obligations. With this goal in mind, Karnes proposed that First National secure its loan by a second mortgage on the property and development (in a "wrap-around" position) but retain $390,000 of the $1,300,000 interim loan to pay off the prior mortgages and accumulated interest in the event of default. Thus, while the proposed scheme would save Dial Investment interest costs, it would also put First National in the position of an inferior lienholder.

From this point the evidence is contradictory. After concluding that the wraparound arrangement was legally feasible, First National agreed to study the proposal further. The parties also discussed obtaining title insurance for the proposed transaction. First National suggested obtaining a clean title insurance policy that excluded references to the Klinker mortgages and gave it a first lien on the Winchester Development. The purpose of this clean title insurance policy is disputed by the parties, however. First National contends that it was purely for its own benefit and protection. The proposed wrap-around scheme left First National in a position of a second lienholder, and it viewed its prerogative to withhold $390,000 of the loan proceeds to pay off the prior liens as inadequate protection. Other evidence supports a contrary purpose. In particular, some testimony indicates that both First National and the long-term lender, Ford Motor Credit Company, required a clean title in order to comply with internal policies designed to avoid auditing difficulties. This testimony suggests that the clean title was intended to be a subterfuge, disguising the true agreement and economic posture of the parties. It is clear that First National was willing to become the interim lender and that it was relying to a great extent on the financial integrity of Karnes and Donald Day, owners of Dial Investment and both

---

1. A "wrap-around" loan, as Karnes understood it, is one in which a lender makes a loan that is subordinate to another debt with the responsibility and ability to cure defaults and make payments on the superior debt. The technique is often used in situations where the superior debt has a lower rate of interest than the wraparound financing. The borrower saves interest charges by "wrapping" the inferior debt "around" the superior debt, rather than using the additional financing to pay off the first or superior mortgage. Peter Hess, a lawyer representing Heitman Mortgage Company in the negotiations, testified in his deposition that Karnes misused the term in applying it to this transaction.

wealthy men, to protect its interest.[2] Neither Karnes nor Day ultimately executed the loan documents as individuals, however.[3]

The confusion continued after the meeting. Some testimony indicated that both First National and Dial Investment agreed to abandon the wrap-around scheme. Karnes, however, testified that Richard Peterson of First National consented to the wrap-around proposal and that its implementation continued.

Sometime after the meeting, Karnes contacted Kathryn Plourde, vice-president and counsel for Fidelity Title, to determine whether Fidelity Title would issue First National a clean title insurance policy in spite of the prior encumbrances, the Klinker mortgages. Fidelity Title agreed to issue the policy but made its acceptance contingent on First National's acceptance of the wrap-around scheme. When Karnes later called and stated that First National had accepted the deal, Fidelity took his word for it, even though Karnes was not an agent of First National.

Fidelity Title also requested a copy of the building loan agreement from Karnes to verify that sufficient funds would be reserved in order to discharge the encumbrances (the three Klinker mortgages) omitted from the policy. For unknown reasons, Fidelity Title was never furnished with a copy of the building loan agreement and did not follow through on its request to examine it.

On April 4, 1974, First National and Dial Investment signed the building loan agreement. The agreement provided, in part:

It is hereby understood and agreed that BORROWER has incurred an indebtedness in the sum of $226,000.00 to Anna C. Klinker and John Klinker ("Klinker"), said indebtedness being secured by a Real Estate Mortgage by and between Dial Construction Company, Inc. and Klinker covering that certain property described in Exhibit "C" attached hereto and made a part hereof. *BORROWER hereby represents that it has caused the Title Insurance Company to delete reference to the said Real Estate Mortgage from its Policy of Title Insurance in favor of LENDER, and has caused the Title Insurance Company to guarantee to LENDER that LENDER's lien is a first mortgage against said property.* BORROWER hereby authorizes LENDER to reserve the sum of THREE HUNDRED NINETY THOUSAND AND NO/100 ($390,000.00) DOLLARS to enable LENDER, at any time hereafter, to pay off the said Klinker Mortgage; and BORROWER hereby appoints LENDER its attorney-in-fact for the purposes of paying off such indebtedness to Klinker. *Nothing herein contained shall impose upon*

---

**2.** Richard Peterson, assistant vice president of First National and First National's representative at the October 1973 meeting, made the following comment about the proposed loan in a memorandum to the file:

Our loan would be to the Dial Investment Company, Inc., which as of September 30, 1972, shows a net worth of $47,800. *The strength to [sic] this loan is in the guaranties of the two owners of Dial Investment Company, Inc., Donald Day and Ewel Karnes, Jr., who show respective net worths of $3,077,600. and $4,042,400.* Both of these gentlemen's net worth lies mainly in their real estate equities. As partners (50–50 basis), they own approximately 800 apartments and 125 townhouses in Omaha, Bellevue and Grand Island, Nebraska, area. All of these units are of high quality and consistently maintain occupancy levels of nearly 100%. Through Dial Realty, Inc., Dial Construction Company and Dial Investment Company, Inc., Don Day and Ewel Karnes have built and developed over 2300 apartment units, several office buildings and several shopping centers. In addition, they have put together three previous planned developments similar to our proposal and all have been extremely successful.

We will receive an assignment of all leases and rentals relating to the subject property. The release schedule on specific areas and lots has been established by F.M.C.C. and is based on 95% of an appraised land value of $2,539,000. We anticipate that the loan will never exceed $800,000. outstanding because of the release structure. Heitman Mortgage Company will administer this loan for us. (Emphasis added)

**3.** Although both Karnes and Day signed the promissory note, they signed only on behalf of Dial Investment, Inc.

*LENDER any such obligation to pay off the said Klinker Mortgage.* BORROWER hereby agrees that any default under the terms of the said Klinker Mortgage which would enable the Klinkers to foreclose said Mortgage, shall also constitute a default hereunder. (Emphasis added) [4]

Significantly, the agreement authorizes the lender to reserve $390,000 to discharge the Klinker mortgages, as contemplated by the proposed wrap-around financing scheme, but does not *obligate* the lender to use the money for that purpose. On the same day, Dial Investment executed and delivered to First National a promissory note and mortgage for the interim loan. These documents were subsequently recorded by First National.

The next day, April 5, 1974, Peter Hess, on behalf of Heitman Mortgage Company (the mortgage broker), sent the following letter to Kathryn Plourde of Fidelity Title:

> In connection with that certain Mortgage Loan in the principal amount of $1,300,-000.00, being made by First Minneapolis to Dial Investment Company, please be advised that the undersigned will cause to be deposited with you the sum of approximately $500,000.00 sometime next week.
>
> You should have, on this date, recorded the Mortgage from Dial Investment Company to First Minneapolis. On the date that you disburse the funds which I will cause to be deposited with you as aforesaid, you are to be in a position to issue to First Minneapolis (but to be sent to the undersigned) your standard ALTA Loan Policy–1970 with ALTA Endorsement Form 1 coverage (amended 10–17–70) with Endorsements attached insuring over the questions of Usury and Truth-In-Lending and *insuring First Minneapolis in the amount which you disburse as holder of record of a first and superior lien upon the mortgaged premises as of the date of your said disbursement * * *.* (Emphasis added)

On March 22, 1974, Dial Investment purchased Winchester Heights from the Klinkers and gave them purchase money mortgages that were recorded on May 13, 1974. Fidelity Title then issued title policy M 14627 on April 29, 1974. The policy insured First National against loss or damage, not exceeding $1,300,000 (the full amount of the interim loan), sustained by reason of any lien or encumbrances on the title to Winchester Heights, other than those set forth in Schedule B of the policy.[5]

The Klinker mortgages were not among the exceptions specifically listed on Schedule B. Another part of the policy, however, titled Exclusions From Coverage, "expressly excluded from the coverage of this policy:"

> Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant * * *.

The interpretation of this clause is fundamental to the outcome of this case.

Although Fidelity Title now alleges that the Klinker mortgages constituted prior encumbrances excluded from coverage under the policy by the express language of para-

---

4. Although the Klinker debt totalled $226,000, the building loan agreement authorized the Bank to reserve $390,000. The margin apparently was to cover interest that would accumulate on the debt.

5. The operative language of the policy read: SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, FIDELITY NATIONAL TITLE INSURANCE COMPANY, a Nebraska corporation, herein called the Company, insures as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;

2. Any defect in or lien or encumbrance on such title;

   * * * * * *

6. The priority of any lien or encumbrance over the lien of the insured mortgage. (Emphasis added)

graph 3(a) of the Exclusions From Coverage and also by agreement of the parties, it obtained additional protection in the form of an indemnity agreement from Dial Investment and the principals of that corporation, Karnes and Day:

In consideration of your having agreed to issue a Mortgagee's policy affording extended coverage in the amount of One Million Three Hundred Thousand Dollars ($1,300,000.00) in the name of Dial Investment Company, Inc., *insuring the priority of the lien of a mortgage to First Minneapolis, a national banking association, in said amount,* omitting from the policy a mortgage from Dial Investment Co. to Anna C. Klinker, a widow, filed in Book 2019 at Page 13 of the Mortgage Records of Douglas County, Nebraska, and a mortgage from Dial Investment Co. to John Klinker and Marvely Klinker, husband and wife, filed in Book 2019 at Page 16 of the Mortgage Records of Douglas County, Nebraska;

We hereby agree to indemnify Fidelity National Title Insurance Company to the full extent of any costs, expenses, or losses of any nature whatsoever which said company may sustain or incur *by reason of the omission of the above described two mortgages on the Mortgagee's policy.* (Emphasis added)

The development scheme collapsed on February 28, 1975, when Dial Investment defaulted on its mortgage obligation to First National. At that time Dial Investment owed First National $752,690.28, excluding interest. First National then began mortgage foreclosure proceedings in the District Court of Douglas County, Nebraska joining all interested parties as defendants, including the Klinkers. The Klinkers counterclaimed, contending that contrary to the provision of title policy M 14627, their mortgage liens were prior. First National notified Fidelity Title of the counterclaim and requested that Fidelity defend it. Fidelity refused to do so, and First National instituted a third party action against Fidelity Title as part of the same proceeding.

On April 26, 1976, the state court entered a decree in the foreclosure proceedings finding that the Klinker mortgages were prior to First National's lien. First National then commenced the present action in federal district court seeking a declaratory judgment that Fidelity Title' was liable as title insurer for the full amount owed First National.

II.

The parties agree on one essential point: Our analysis must begin with the terms of the title insurance policy. In particular, our task is to determine whether or not the Klinker mortgages were encumbrances "created, suffered, assumed or agreed to" by First National under the language of paragraph 3(a) of the title policy's Exclusions From Coverage.

In addition, appellant First National claims that even if it did create, suffer, assume or agree to the Klinker mortgages, Fidelity Title "waived" the exclusion and now is "estopped" from asserting it. Appellant's assertion of a second basis for recovery only serves to obscure the fundamental question in the case, however. Which party assumed the risk of the developer's failure? In other words, did First National accept a position as secondary lienholder to the Klinker mortgages notwithstanding the terms of its insurance coverage? Alternatively, did Fidelity Title agree to give First National a clean title insurance policy even though it knew of the existence of the prior encumbrance? If Fidelity Title assumed the risk, then of course it has "waived" the paragraph 3(a) exclusion and is "estopped" from asserting it. To use those terms, however, does not create an additional ground for questioning the district court's decision.

Although both parties spend a great deal of time in their briefs debating the definitions of "created, suffered, assumed or agreed to," we deem that discussion to be largely irrelevant. As we have already stated, the real question is who agreed to bear the risk of default and the consequent priority of the Klinker mortgages.

The terms are useful in one sense, however; they define the perspective that the court must use in judging the parties' intentions vis-a-vis the title insurance policy. The paragraph 3(a) exclusion indicates that the insured, First National, must create, suffer, assume or agree to the encumbrance. Thus, in reviewing the evidence we must focus on items that bear on the intent of First National.

## III.

## A.

██ We begin by observing that the body of the title policy insures First National against "[a]ny defect in or lien or encumbrance on such title" subject to the exclusions from coverage and exceptions contained in Schedule B. Because the Klinker mortgages were not expressly excluded from coverage in Schedule B this language obviously implies that First National is insured as first lienholder, and the burden falls upon the insurer, Fidelity Title, to prove that First National agreed to an exclusion from the coverage, *i. e.*, that it "created, suffered or agreed to" the Klinker mortgages. Familiar construction principles support this conclusion. As a general rule insurance policies are construed in favor of the insured and against the insurer. Because the insurer typically drafts the insurance contract, it is in the best position to protect its interest. Thus, in order to balance the scales, ambiguities are construed against the insurer. Therefore, the burden of proof properly falls upon the insurer, Fidelity Title, to establish the existence of an exclusion from coverage.

To assess the intent of First National relative to the insurance policy we must turn to extrinsic evidence. Nebraska law [6] permits the use of parole evidence to interpret ambiguous contractual terms. *See, e.*

g., Smith v. Cobleigh Elec. Co., 196 Neb. 711, 246 N.W.2d 55 (1976).

In its review of the evidence before it rendered summary judgment in favor of the defendant, the district court determined that:

> Despite [Banker] Peterson's testimony that he would not have disbursed any funds under the loan agreement in the absence of the title insurance policy insuring the first mortgage lien on the Bank, this misplaced reliance based upon the conduct of the parties cannot justify recovery. The very language of the loan agreement states that Dial "has caused the Title Insurance Company to guarantee to Lender that Lender's lien is a first mortgage against said property."

The court concluded:

> The "tangled web" weaved by the parties to the loan transactions in October or November, 1973, was an unconscionable scheme for which defendant cannot be held liable.

We review these crucial comments in the memorandum opinion against the backdrop of Federal Rule of Civil Procedure 56(c), which restricts summary judgment to cases where the evidence shows "no genuine issue as to any material fact." We recently commented in reference to Rule 56(c) that

> [I]t is an extreme remedy which is not to be granted unless the movant has established his right to judgment with such clarity as to leave no room for controversy and that the other party is not entitled to judgment under any circumstances; the court must view the facts most favorably to the party opposing the motion and give that party the benefit of any reasonable inferences to be drawn from the facts. [*Unlaub Co. v. Sexton*, 568 F.2d 72 at p. 76 (8th Cir. 1977).]

---

6. Our jurisdiction in this case is based on diversity of citizenship. Accordingly, we must apply the appropriate state substantive law, in this case Nebraska's. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

B.

■ In the lower court, Fidelity Title sought to prove (and succeeded in convincing the district court as a matter of law) that the title insurance policy was subject to a collateral agreement: the building loan agreement. That agreement authorized First National to retain $390,000 of the loan proceeds to pay off the Klinker mortgages. From this Fidelity Title infers that:

> First National * * * permitted and agreed to the Klinker indebtedness on the property and by virtue of the ability to pay them off at anytime, could have prevented their lien at anytime.

In rebuttal, First National points out that: (a) although it was permitted to retain $390,000 of the loan proceeds to pay off the Klinker mortgages, it was not *required* to do so; (b) the building loan agreement also contained the following language:

> BORROWER hereby represents that it has caused the Title Insurance Company to delete reference to the said Real Estate Mortgage from its Policy of Title Insurance in favor of LENDER, and has caused the Title Insurance Company to guarantee to LENDER that LENDER's lien is a first mortgage against said property.

First National also relies on the letter sent by attorney Hess on behalf of Heitman, the mortgage broker, to Kathryn Plourde of Fidelity Title on April 5, 1974, in which Hess declared:

> You should have, on this date, recorded the Mortgage from Dial Investment Company to First Minneapolis. On the date that you disburse the funds which I will cause to be deposited with you as aforesaid, you are to be in a position to issue to First Minneapolis (but to be sent to the undersigned) your standard ALTA Loan Policy–1970 with ALTA Endorsement Form 1 coverage (amended 10–17–70) with Endorsements attached insuring over the questions of Usury and Truth-In-Lending and *insuring First Minneapolis in the amount which you disburse as holder of record of a first and superior lien upon the mortgaged premises as of the date of your said disbursement * * *.* (Emphasis added)

This evidence, even without considering the contradictory testimony within the depositions of the various principals participating in contract negotiations, is enough to convince us that summary judgment was improvidently granted. This is not a case in which one party "has established his right to judgment with such clarity as to leave no room for controversy." *Unlaub v. Sexton, supra,* at 76. Indeed, we are hard-pressed to say in which direction the evidence tilts in this case. On the record before us we certainly cannot conclude that the transaction constituted an unconscionable scheme on the part of the plaintiff-Bank. The parties apparently both relied on the financial worth of Karnes and Day. Neither party expected the development to fail; accordingly, they neglected to allocate unequivocably the risk to one party or the other.

■ As a final note, we direct the district court's attention to the discussion in parts II and III A of this opinion. The court must focus on evidence related to the intent of First National because it is the party that must create, suffer, assume or agree to the prior encumbrances. For that reason, evidence about Fidelity Title's intent or purpose is largely irrelevant. The burden also rests upon Fidelity Title to prove by a preponderance of the evidence that First National assumed, suffered or agreed to the prior encumbrance.[7]

■ The resolution of that issue is one of fact, not law. First National's knowledge that prior encumbrances existed will not absolve the insurer from liability for them unless the insurer also establishes by a pre-

---

7. Clearly First National did not "create" the prior encumbrances, although it may have "suffered," "agreed to," or "assumed" them.

ponderance of the evidence that the bank agreed that its mortgage would occupy a secondary position to the purchase money mortgages.