**BANKERS TRUST COMPANY, Plaintiff-Appellant,**

v.

**TRANSAMERICA TITLE INSURANCE COMPANY, Defendant-Appellee.**

No. 77–1386.

United States Court of Appeals, Tenth Circuit.

Submitted Oct. 25, 1978.

Decided Feb. 8, 1979.

---

* The Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

James J. Morrato (Roger L. Keithley, Denver, Colo., on brief) of Morrato, Gueck & Colantuno, Denver, Colo., for plaintiff-appellant.

Peter C. Dietze (Joel C. Davis, Boulder, Colo., on brief) of Dietze and Davis, Boulder, Colo., for defendant-appellee.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Bankers Trust Company (Bankers) appeals from an order granting a Summary Judgment to Transamerica Title Insurance Company (Transamerica) in a breach of contract action brought by Bankers. Jurisdiction vests by reason of diversity.

Bankers agreed to loan funds to Breaks Land Corporation (Borrower) in amount of $2,750,000.00 toward the construction of an apartment complex in Colorado Springs, Colorado. Inasmuch as the estimated total cost of the project ranged upwards of $3,200,000.00, Bankers required of Borrower and Borrower agreed to provide, from other sources, the additional funds necessary for completion of the Project construction. The Construction Loan Agreement entered into between Bankers and Borrower on November 14, 1972, provided that the committed loan funds would be released by Bankers on a percentage of construction completion basis. However, Bankers agreed to the advance of $400,000.00 from those funds to Borrower to pay off the balance owing for acquisition of the Project land. This, of course, reduced the loan fund balance to $2,350,000.00, available for construction proper.

Concurrent with the execution of the Construction Loan Agreement, Borrower executed and delivered to Bankers a First Deed of Trust to secure the entire loan indebtedness. Inasmuch as Bankers is a New York corporation, without disbursement offices in Colorado, and because it was not providing 100 percent of the construction funds, Bankers and Borrower agreed that a third party, Transamerica, should be engaged to assume the responsibility of disbursing Bankers' committed loan funds to the contractor and/or subcontractors as construction progressed. As part and parcel of this arrangement, Transamerica issued a title insurance policy to Bankers which insured Bankers a priority against any mechanic liens. In addition—and critical to the controversy presented here—Bankers and Transamerica entered into a Disbursement Agreement whereby Transamerica assumed the responsibility for disbursing the funds advanced by Bankers pursuant to the Loan Agreement to the *proper* claimants as construction progressed.

Bankers contends that because under the terms of the Disbursement Agreement, Transamerica "recognized" that the Bankers' loan commitment was for less than 100 percent of the anticipated cost of construction and that Borrower was required to provide the additional construction funds, that the proviso in the Disbursement Agreement which provides that Transamerica would disburse the loan funds in such a manner that no mechanic liens would be filed against the Project property is absolute. (Brief of Appellant, p. 3, citing to R., Vol. I, 28–32). Bankers thus concludes that "the purpose of this agreement was to secure 'mechanic lien indemnification' to the extent that construction funds were advanced by Bankers to Transamerica and disbursed by Transamerica to the various contractors." [Brief of Appellant, p. 3.]

We observe that there is nothing in the Disbursement Agreement which expressly speaks to the alleged agreement by Borrower to advance additional funds. To be sure, there is a proviso that prior to final disbursement of the Bankers loan fund, the Borrower must complete construction of the Project and furnish a final completion survey. [R., Vol. I, p. 31.] The Disbursement Agreement was executed by the Borrower/Owner, Breaks Land Corporation, Cokany Construction Co., the prime contractor, Transamerica and Bankers. [R., Vol. I, p. 32.] The Disbursement Agreement establishes a method and conditions relating to preadvancement of loan funds arrived at between Bankers and Borrower. Transamerica was not involved in that aspect of the agreement. Prior to any disbursement of funds advanced by Bankers, Transamerica did agree, upon its payment thereof to contractor, subcontractor and materialmen to secure lien waivers. [R., Vol. I, p. 30.] This covenant, in our view, clearly contemplated that adequate funds were to be made available to Transamerica in order to satisfy claims. Paragraph 6 of the Agreement provides that Transamerica insures Bankers against any loss by reason of mechanics' liens on the Project and " . . . will guarantee that any payment made shall be for materials incorporated into the construction or labor performed in connection with such construction." [R., Vol. I, pp. 31, 32.] Paragraph 7 provides that in no event shall the Disbursement Agreement be construed " . . . so as to make Lender or Transamerica liable to materialmen, contractors . . . in connection with the Project or for death or *claims* accruing . . . against the Borrower/Owner or the Contractor . . ." [R., Vol. I, p. 32.] Paragraph 8 provides that Transamerica shall, at the time of its disbursement of Bankers funds advanced pursuant to the pay-request procedure established by Bankers and Borrower under the agreement, issue to Bankers an endorsement of its title insurance policy that *at the time of such disbursement there were no new liens* (other than Bankers' first lien) *on the Project.* [R., Vol. I, p. 32.]

The complaint herein was filed by Bankers on December 30, 1975, with attached exhibits representing the Transamerica Policy of Title Insurance and the Disbursement Agreement. Transamerica filed its Answer to the First and Second claims for relief on January 16, 1976, and its Answer to the Third claim for relief on March 1, 1976. Thereafter, Transamerica submitted interrogatories and took three depositions of Bankers officials or former officials, the last of which was taken on September 16, 1976. Transamerica filed its Motion for Summary Judgment on September 20, 1976, based upon the pleadings, the answers to interrogatories, depositions and documents obtained by discovery. The motion was accompanied by Transamerica's memorandum brief in support thereof. Bankers filed a memorandum brief in opposition to the motion, contending that there were significant issues of fact outstanding which precluded the summary judgment. The District Court entertained oral arguments on the motion for summary judgment on November 26, 1976, almost one year from the date Bankers instituted suit. Counsel for Transamerica argued that the contractual relationship between Transamerica and Bankers was clear, i. e., that Transamerica simply agreed to guarantee Bankers that any disbursements it made of loan funds advanced to it from Bankers would be paid on valid, proper invoices to those who performed work or services or supplied materials and that none of the disbursements would be made to other than bona fide claimants. Counsel for Bankers argued that the Disbursement Agreement clearly obligates Transamerica to guarantee to Bankers that " . . . when the monies would be advanced by the bank to the title company, and by them paid to the contractors, that up to that point in time, the project was free of liens and the deed of trust . . . was in fact first." [R., Vol. II, p. 13.] Counsel for Bankers also contended that the loan funds held by Bankers at the date it declared default represented money for "future construction down the road" [R., Vol. II, p. 14.] even while acknowledging that the real

cause of the default was Borrower's failure in December, 1973, to "put up" the additional or supplemental construction monies when called upon by Bankers to do so. [R., Vol. II, p. 16.]

The District Court entered its Memorandum and Order and Judgment on April 19, 1977, granting Transamerica's motion for summary judgment of dismissal, based upon all of the pleadings and memoranda. The Court found that there was no genuine issue as to the material facts.

On appeal, Bankers contends that the District Court erred in granting the motion for summary judgment in that: (1) there exist genuine issues of material fact which can only be resolved upon an evidentiary record and that the Court relied merely upon the arguments of counsel as to their interpretations of the contractual obligations and their "versions" of the facts, and, (2) assuming, *arguendo*, that summary judgment was procedurally proper, still the Court misinterpreted the contractual obligations of the parties. We disagree. We hold that the District Court did not err in granting Transamerica's motion for summary judgment.

On November 14, 1972, Bankers Trust Company ("Bankers") entered into a loan agreement with Breaks Land Corporation ("Breaks") for the construction of 12 apartment buildings on property owned by Breaks. The plaintiff obligated itself to make a construction and a permanent loan to Breaks, each in the amount of $2,750,000.00, secured by a first deed of trust. The defendant, Transamerica Title Insurance Company ("Transamerica") issued a mortgagee's title insurance policy to the plaintiff and Transamerica also became disbursing agent under a disbursement agreement which provided for payments according to pay requests approved by the contractor and the borrower. The proceeds of the construction loan were to be advanced at such times and in such amounts as Bankers determined.

From November 14, 1972 until January, 1974 Bankers made 13 advances of loan proceeds, totaling $1,705,884.00. Con-struction was halted on February, 1974 and the plaintiff declared the loan in default. At that time, mechanics' liens had been filed against the property in the aggregate amount of $325,871.00. As a result of a foreclosure, Bankers acquired the property on its bid for the amount of the loan proceeds advanced, with interest. Mechanics' lien foreclosure suits were filed and defended by the title insurance company. All of the liens were determined to be valid.

There is no basis in fact for any claim that Transamerica misapplied or failed to disburse properly the funds which were advanced through it as disbursing agent. Bankers characterizes the obligation of Transamerica under the disbursement agreement as a responsibility to pay the loan proceeds in such manner as would protect both the borrower and the plaintiff from mechanics' liens to the extent of the funds disbursed. That is accurate. Here, however, the difficulty is that the cost of the work performed was greater than the money made available for payment. Transamerica was obliged to protect against the possibility of plaintiff paying twice for the same work. The defendant did not assume any obligation to pay for this project itself if neither Bankers nor Breaks provided the necessary funds.

The plaintiff's contention is that even though it failed to pay the full amount of the loan commitment, recovery may be had on the title insurance policy simply because mechanics' liens attached to the property. *In effect, it is claimed that by the issuance of a title insurance policy, Transamerica became a guarantor of payment for all work actually performed. That is more than the insurance contract calls for. Where, as here, work was performed and payment was not made up to the amount of the lender's loan commitment, the resulting mechanics' liens must be considered to have been created or suffered by the insured claimant and such liens are expressly excluded from coverage by the language of the title policy.* Accordingly, the first and second claims

for relief are beyond the scope of the insurance policy and disbursement agreement and there is no basis for any liability of Transamerica under them.

The third claim for relief alleges negligence in the defense of the mechanics' lien suits. No facts have been set forth to support such a contention and counsel for the plaintiff has conceded that those liens were laid and had to be paid. Transamerica was obliged to defend against invalid claims but it did not have the duty to make the best possible compromise of valid claims through negotiation. (Emphasis supplied.)

[R., Vol. I, pp. 83–85.]

█ Summary judgment must be denied unless the moving party demonstrates his entitlement to it beyond a reasonable doubt. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027 (10th Cir. 1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33 (10th Cir. 1975). The courts must consider factual inferences as tending to show triable issues of material facts in the light most favorable to the existence of such issues in assessing a motion for summary judgment. *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168 (10th Cir. 1974). Pleadings and documentary evidence must be construed liberally in favor of the party opposing such a motion. *Harman v. Diversified Medical Investments Corporation*, 488 F.2d 111 (10th Cir. 1973), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). When a motion for summary judgment is made and supported by depositions and documents, as here, the adverse party may not rest upon the mere allegations but his response, by affidavit or otherwise, must demonstrate, by specific facts, that there is a genuine issue for trial. Fed.Rules Civ.Proc. rule 56(e), 28 U.S.C.A.; *Ando v. Great Western Sugar Co.*, 475 F.2d 531 (10th Cir. 1973).

█ Richard Stanley Merrell, who served as Bankers' chief loan officer and who was in charge of the administration of the Breaks loan, was deposed at length. He disclosed that the cost of construction was estimated at $2,625,000.00 and acquisition of land at $300,000.00 at the time the loan was negotiated, making a total "package" of $3,200,000.00. [Vol. IV, pp. 33, 39.]; a group known as United Housing Group entered into an agreement with Bankers that if, at any time, the construction commitment funds of Bankers on the Breaks Project were not sufficient, the Group would "put up" the additional funds to insure completion of the project. [Vol. IV, pp. 40, 41.] The "Group" was composed of individual bankers known to be financially responsible and any anticipated cost "overrun" was of no concern to Bankers because of the fact that the project was " . . . backed up by a personal guarantee of the principals." [R., Vol. IV, p. 45.] These guarantees were obtained by Bankers because it was anticipated that the loan funds committed by Bankers to the construction project would not be sufficient. [R., Vol. IV, p. 45.] Merrell stated that sometime in November or December of 1973, Bankers learned that the construction work was running "quite a bit more" than the sum budgeted for and that a "lien" had been produced; as a consequence, Bankers called upon the guarantors to "come up with the money" representing the difference between " . . . the amounts requested (by the contractor from the Bankers loan funds) and the amount justified by engineers' inspection." [R., Vol. IV, pp. 47–49]; Bankers advanced the funds to Transamerica based upon the "on site" engineering estimates of Gibbons and Associates, which were percentage completion reports, i. e., Bankers would advance the percentile funds indicated by the completion reports of its engineering experts which had no relationship to the "draw request" for funds from the Borrower; Bankers, after deducting the "land draw," dedicated $2,350,000.00 to the construction proper and its advances of funds to Transamerica were based upon the "certified completion percentages" against that sum. [R., Vol. IV, pp. 54, 55.] Thus, it is unchallenged that Bankers advanced funds to Transamerica *not* predicated on the moneys due and owing the contractor or subcontractors *in fact* at any particular time but rather, *and only*, strictly "accord-

ing to the percentage complete" certified to Bankers by *its* experts. [R., Vol. IV, pp. 55, 56.] Accordingly, based on estimate only, the $2,350,000.00 committed by Bankers for construction proper represented simply the funds to be made available by Bankers for the Project construction; however, it had no *real* relationship to the *actual* cost of construction. [R., Vol. IV, pp. 56, 57.] Thus, Merrell testified that during the month of September, 1973, the expert analysis submitted to Bankers showed that total construction cost completion was then estimated at $2,800,000.00 and that, accordingly, Bankers' loan commitment of $2,350,-000.00 would not cover the *actual* estimated completion costs. [R., Vol. IV, p. 57.] Bankers did advance some additional funds to " . . . keep them alive for another month, anyway, and until they could infuse their own capital or whatever." [R., Vol. IV, p. 58.] Merrell acknowledged that Transamerica was at all times " . . . preparing the draw request[s] . . . looking at actual costs of construction figures" based upon *actual invoices.* [R., Vol. IV, p. 59.] That Bankers and Transamerica were predicating the advancement of funds on different basis is, we believe, evidenced by this testimony given by Merrell: "Well, on the percentage disbursement procedures, such as we used here, you can't use the Borrower's estimate of construction and so on because, generally speaking, you're coming to a figure, and this is in the initial analysis of the thing, where you're lending a certain number of dollars, which is limited by the appraisal [of percentage completion] which comes back, and usually on an economic basis, which is the most important of the approaches to value. This limits the amount of money that you can loan on any particular deal. It may be a hundred per cent of the construction cost and then again it may not be. But your initial analysis takes into consideration the strength of the borrower, his ability to obtain additional funds and any other . . . well, you call 'em underwriting considerations, as to whether or not these chaps are going to be able to finish the project with the funds available. You come to a conclusion at that point that yes, they will be able to finish the project out if the loan is X number of dollars. Okay. If it takes X plus Y number of dollars, you're looking to them for the Y figure." [R., Vol. IV, pp. 60, 61.] There is no question, then, that Bankers at all times relied upon its Loan Agreement with Borrower to the extent that if at any time the funds loaned were insufficient to complete the Project, Bankers would simply call upon Borrower to produce the additional monies required to do so. [R., Vol. IV, p. 63.] Thus, Bankers position was that any construction cost "overruns" would require that the Borrowers "come up" with the additional funds to meet them. [R., Vol. IV, p. 65.] Merrell recalled that sometime in November of 1973, some "lien problems" had begun to "pop up"; that Transamerica did not have sufficient disbursement funds to pay the liens; that a meeting was thereafter held between representatives of Bankers, Borrower and Transamerica on December 17, 1973, which was delayed from time to time in order to get everyone together; that Bankers had "frozen" fund disbursements since November when it learned of the existence of liens; that Bankers brought in a Mr. Dobrowolsky to oversee the situation and about three weeks expired, constituting a delay, while he studied the status of the project loan; that Dobrowolsky reviewed the loan files and documentation with a close scrutiny and this resulted in delays; that the "principals" agreed with Bankers to "come up" with the necessary monies to clear the liens " . . . to put the bank in a position where they could feel free to disburse" but that they did not do so; that Bankers did not advance additional loan funds to Transamerica for disbursement to pay the lien claims because this would " . . . .push it [the percentage completion disbursement plan] so far out of whack that it would be relatively impossible to get it back into a percentage-versus percentage basis"; that under the modified gross percentage plan, it was the responsibility of Borrower to come up with the money to satisfy the liens and it was not the responsibility of Bankers. [R., Vol. IV, pp. 67–75.] Merrell said that if

Bankers had advanced additional loan funds to Transamerica for disbursement in satisfaction of the liens this would have placed the percentage of completion monies versus the completion funds disbursed "out of whack" even though Bankers did have some $260,000.00 loan funds undisbursed when it "discovered" the cost overruns and it then requested that the United Housing Group come up with the additional funds to clear the liens. [R., Vol. IV, pp. 76, 77.] Merrell believed that the additional funds would come from the United Group (limited partnership). [R., Vol. IV, p. 78.] Merrell said that Bankers' criterion was based exclusively on the aforesaid cost projections and that when costs ran in excess of projections, Bankers *would not* advance further loan funds upon "draw requests" it had received but would "look to the borrowers to make up the difference on that." [R., Vol. IV, pp. 80, 81.] Merrell's interpretation of the title policy issued Bankers by Transamerica in relation to "lien protection" on the Breaks Project was simply that as Transamerica disbursed loan funds advanced by Bankers, it would obtain lien waivers from the subcontractors, but he *did not* look upon Transamerica as a guarantor of the completion of the project based upon the loan commitment or the percentage estimates. [R., Vol. IV, pp. 85–87.] In other words, he saw Transamerica's duty, as disbursing agent, to simply see that the funds advanced by Bankers were paid to the "right people," i. e., those who actually had valid claims for work or services performed or materials supplied to the Breaks Project. [R., Vol. IV, pp. 85, 86.] Merrell stated that in December of 1973, Bankers became aware of a "very large discrepancy between what is available based on 43.6 per cent of the completion for the Breaks and the [draw] request of $266,500.00" [from Transamerica] and that Transamerica had disbursed some $37,000.00 before this "error" was discovered by Bankers. [R., Vol. IV, p. 92.] Significantly, Merrell *did not* at any time state that Transamerica disbursed any of the loan funds to subcontractors whose claims [per invoices] *were not valid.*

William E. Viklund of New York, Senior Vice President of Bankers, was deposed. He served in the real estate area. He testified that even though Bankers' consulting engineer opined that the estimated cost on the Breaks Project of $2,623,516.00 would be inadequate by approximately $150,000.00 to $200,000.00 that, nevertheless, Bankers disbursed $400,000.00 of these funds originally to pay off a prior encumbrance on the project land. [R., Vol. V, pp. 34, 35.] Thus, based on the estimated construction costs, it was evident that construction cost "overruns" would occur requiring additional funds from the Borrowers. [R., Vol. V, pp. 38–40.] Viklund stated that it was Merrell's responsibility, on behalf of Bankers, to be sure that the Borrowers had the ability to advance additional funds to complete the Breaks Project, beyond the Bankers' loan, particularly inasmuch as Bankers anticipated shortages of some $200,000.00 above its loan commitment. [R., Vol. V, pp. 42–47.] If more funds than those committed by Bankers' loan to the Breaks Project were required to complete construction, the Borrower would be expected to tender these funds to Bankers and not to Transamerica. [R., Vol. V, p. 51.] Bankers did not require Borrowers to "put up" any performance bond or completion bond. [R., Vol. IV, pp. 83, 84.] Viklund stated that Merrell demanded that the principals [Borrowers] "clear the liens" filed against the Project property by putting up the necessary monies but that they did not do so and thereupon Bankers terminated funding the loan [Project] even though some $962,000.00 of the commitment funds remained with Bankers. [R., Vol. V, pp. 54, 55.] When asked why Bankers did not apply the funds committed in payment of the work that had been done, Viklund responded: "Because of the default for arrears, because of the liens on the property and because of the borrowers' inability to put sufficient additional funds in the job to assure us of completion." [R., Vol. V, p. 55.] Viklund estimated that the total of the liens filed amounted to about $450,000.00 at a time when Bankers had on hand $962,000.00 of the loan commitment. [R., Vol. V, p. 57.] He also stated

that he was not aware of any loan funds advanced by Bankers which had not been paid by Transamerica to those entitled thereto. [R., Vol. V, p. 57.] Viklund stated that the problems with the Breaks Project arose by reason of *"cost overruns"* and that the same problem confronted other developers across the entire country. [R., Vol. V, p. 58.]

We believe that the aforesaid review of the pleadings, interrogatories, depositions and documents fully demonstrates that no genuine issue as to any material fact exists.

We thus hold that Bankers' contention that the District Court erred in granting Transamerica's motion for summary judgment and dismissing Bankers' complaint and cause of action is without merit.

WE AFFIRM.