**William BROWN, Trustee, Appellee/Cross–Appellant,**

v.

**ST. PAUL TITLE INSURANCE CORPORATION, Appellant/Cross–Appellee.**

Nos. 79–1935, 79–1967.

United States Court of Appeals, Eighth Circuit.

Submitted April 17, 1980.

Decided Nov. 18, 1980.

As Amended Nov. 19, 1980.

Robert C. Jones, Clayton, Mo., for appellant/cross appellee.

G. Carroll Stribling, Jr., Clayton, Mo., for appellee/cross appellant.

Before HEANEY and ARNOLD, Circuit Judges, and WRIGHT,[*] District Judge.

SCOTT O. WRIGHT, District Judge.

St. Paul Title Insurance Corporation, appellant/cross–appellee herein, appeals from the judgment of the district court[1] holding that St. Paul breached its policy of title

insurance in refusing to defend or discharge certain mechanic's liens having priority over the insured's mortgage. William Brown, trustee in bankruptcy and plaintiff below, cross–appeals, contending that the trial court erred in refusing to award plaintiff statutory penalties and attorney's fees under Missouri's "vexatious refusal to pay" statute.[2] For reasons stated below, we find that St. Paul's refusal to defend or discharge the liens in question did not constitute a breach of its title insurance policy and, accordingly, we reverse the judgment of the district court. In so holding, plaintiff's claim for statutory penalties and attorney's fees becomes moot.

### I.

This controversy arose as a result of the failure of a real estate venture in St. Charles County, Missouri, known as Lake St. Louis Estates. In March, 1974, Citizens Mortgage Investment Trust[3] [hereinafter CMIT] became the primary construction lender for the Lake St. Louis Estates project and, pursuant to a loan agreement with the project's developer, initially advanced over $10,000,000 to pay off prior construction lenders. CMIT also agreed to make further advances, up to a maximum of $17,000,000, subject to the conditions set forth in the loan agreement. The loan was primarily secured by a deed of trust and a first lien mortgage on the property comprising the Lake St. Louis development.

In order to protect its interest in the real estate securing the loan, CMIT purchased a

[*] The Hon. SCOTT O. WRIGHT, United States District Judge for the Western District of Missouri, sitting by designation.

1. The Hon. James H. Meredith, Senior United States District Judge for the Eastern District of Missouri. The district court's opinion is reported at 478 F.Supp. 1041 (E.D.Mo.1979).

2. The applicable statute, § 375.420, RSMo., provides:

In any action against any insurance company to recover the amount of any loss under a policy of fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance, if it appear from the evidence that such company has vexatiously

refused to pay such loss, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed ten per cent on the amount of the loss and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.

3. This action was initiated by Alfred Deutsch and Harold Finney, trustees in bankruptcy for Citizens Mortgage Investment Trust. Prior to the district court's decision, William Brown, appellee/cross–appellant herein, was appointed trustee in bankruptcy for CMIT and was substituted as a party plaintiff. For purposes of this opinion, we will refer to CMIT as the plaintiff.

title insurance policy from St. Paul Title Insurance Corporation insuring CMIT against any loss or damage suffered by reason of defects in the title to the property or by reason of liens or encumbrances on the property itself. The policy specifically provided, *inter alia*, that St. Paul insured CMIT against any loss incurred by reason of "any statutory lien for labor or material which now has gained or hereafter may gain priority over the lien of the insured mortgage. . . ." The policy also contained a standard exclusion schedule setting forth those matters which were expressly excluded from the policy's coverage. Among the matters excluded were any defects, liens or encumbrances "created, suffered, assumed or agreed to by the insured claimant. . . ."

St. Paul issued its policy on March 20, 1974, insuring, as of that date, the priority of CMIT's mortgage as the first lien on the Lake St. Louis property. Originally, the policy's coverage was equal to the amount of CMIT's initial advance. The total amount of coverage was periodically increased, however, as CMIT made subsequent advances pursuant to a disbursement agreement with St. Paul. The disbursement procedure agreed to by CMIT and St. Paul essentially worked as follows: As construction on the real estate project progressed, the developer would issue a "draw request" to CMIT certifying that certain work had been satisfactorily completed and requesting that specific contractors and suppliers be paid for services or materials furnished. After a draw request had been reviewed and approved by the proper parties, CMIT would transfer funds to a construction escrow account maintained by St. Paul, and St. Paul would make disbursements directly to the contractors and suppliers. Because each draw request had to be approved before payment could be made, the loan funds were not disbursed to the materialmen the same day the draw request was tendered, and several days would elapse between the request for payment and the date the funds were actually disbursed. Thus, by the time a draw request was finally paid, additional work would be completed between the draw request date

and the disbursement date which would not be covered by the latest draw request. However, even though funds had not been advanced to pay for the improvements made in the interim period, the parties' disbursement agreement required St. Paul to issue an endorsement to its title insurance policy increasing the policy's maximum coverage to the total amount actually advanced by CMIT and moving the effective date of coverage up to the date the funds were disbursed rather than the date the draw request was made. The parties made a total of ten disbursements under this procedure and each time funds were disbursed St. Paul would issue an endorsement to its title insurance policy which would encompass a period of time (*i. e.*, the period between the date of a draw request and actual payment) for which no funds had been made available to pay for construction costs.

On July 29, 1974, the date of CMIT's tenth and last disbursement, CMIT transferred nearly $186,000 to St. Paul's escrow account. That same day CMIT sent St. Paul a letter instructing it on how this money was to be disbursed. A portion of this sum, approximately $19,000 was used to pay expenses incurred by Lake St. Louis Estates Company, the project's developer. The remainder was to be applied to a draw request submitted by the developer on July 16, 1974. CMIT instructed St. Paul to disburse these funds after it had obtained proper receipts or lien waivers from the appropriate subcontractors and suppliers *and* when it was in a position to:

1. insure our advance as being a first and best lien,

2. insure that there are no liens of record or you have insured over any such liens, and

3. issue your endorsement for $185,-598.45 making the total liability at this time $11,061,628.79.

St. Paul disbursed the funds as instructed and subsequently issued an endorsement to its title insurance policy extending the effective date of the policy to July 30, 1974,

and increasing the policy's coverage to $11,-061,628.79, the total amount actually disbursed as of that date.

Soon after CMIT made its last disbursement, the developer failed to make an interest payment on its construction loan in violation of its loan agreement with CMIT. On August 2, 1974, CMIT sent the developer a notice of its default and demanded payment in full of the principal amount of the loan and the interest due thereon. CMIT also threatened to initiate foreclosure proceedings on the real estate securing its loan unless payment was received by August 5, 1974. However, despite the developer's failure to make payment as demanded, CMIT did not take any immediate action to foreclose and, instead, attempted to work out an arrangement with the developer whereby foreclosure could be avoided. Moreover, although CMIT advanced no additional funds for the Lake St. Louis Estates development after July 29, 1974, the developer continued to work on the project for several weeks after that date. The efforts to salvage the development were ultimately unsuccessful and foreclosure proceedings were commenced in November, 1974.

In November and December, 1974, mechanic's liens were filed against the Lake St. Louis property by Kienstra Ready–Mix and S & S Utility Contracting Company, two subcontractors who had worked on the development. Their liens represented, in part, work and materials provided for the development between July 16, 1974, the date of the last draw request, and July 30, 1974, the date of St. Paul's last endorsement to its title insurance policy. Upon receiving notice of these mechanic's lien claims, CMIT called upon St. Paul to discharge or defend the liens pursuant to its title insurance policy. St. Paul refused to do so and, as grounds for this refusal, stated "that one of the purposes of your clients

[sic] loan was that land improvements go forward, that your client was aware that these improvements were being made and that the funding of the loan . . . was essential to payment [of the subcontractors]." Basically, St. Paul took the position that it was under no obligation to defend the priority of CMIT's lien against the mechanic's liens because CMIT had stopped funding the project after the developer's default and had not given St. Paul the money to pay for the work completed prior to the default.

Following St. Paul's refusal to defend the priority of CMIT's deed of trust over the mechanic's liens, CMIT negotiated a settlement of these claims.[4] Prior to final settlement and payment of these liens, CMIT again requested that St. Paul defend or discharge the liens and St. Paul once again refused. Consequently, after payment of the settlement, CMIT commenced suit against St. Paul in federal district court, alleging that St. Paul's refusal to discharge the mechanic's liens filed by Kienstra and S & S Utility constituted a breach of its title insurance policy. Further alleging that this breach was vexatious and without just cause, CMIT asked the court to award its statutory penalties and attorney's fees pursuant to Missouri's "vexatious refusal to pay" statute.

By agreement of the parties, this case was submitted to the district court on a stipulation of facts and a designated record. The lower court concluded that the disputed mechanic's liens fell within the coverage provided by the title insurance policy and that St. Paul had breached its policy in refusing to defend the insured against these liens. The court specifically rejected St. Paul's contention that it was excused from performing its contract because CMIT failed to advance additional funds for the development after July 29, 1974. The

---

**4.** The parties do not dispute that under Missouri law, the controlling state substantive law in this diversity case, these mechanic's liens were entitled to priority over CMIT's deed of trust. *H. B. Deal Construction Co. v. Labor Discount*

*Center, Inc.*, 418 S.W.2d 940 (Mo.1967). *See generally* Comment, *Mechanic's Liens–Priority Over Mortgages and Deeds of Trust*, 42 Mo.L. Rev. 53, 71–73 (1977).

court, however, denied plaintiff's request for statutory penalties and attorney's fees.[5]

## II.

 We begin our review of this case with some preliminary observations about the nature of a title insurance policy and the circumstances under which exceptions from coverage are usually recognized. The typical title insurance policy promises to indemnify the insured against any loss or damage suffered by reason of defects in the title to the property or by reason of liens or encumbrances on the property itself.[6] Generally speaking, the parties are free to define the exact scope of the policy's coverage and may specify the losses or encumbrances the policy is intended to encompass. *Lawyers Title Insurance Corp. v. Research Loan & Investment Corp.*, 361 F.2d 764, 768 (8th Cir. 1966). But the terms of a title insurance policy are subject to the same rules of construction applicable to insurance policies in general, *id.*; *Minnesota Title Insurance & Trust Co. v. Drexel*, 70 F. 194, 198 (8th Cir. 1895), and any provisions limiting liability or excluding matters from coverage will be strictly construed against the insurer and in favor of the insured. *First National Bank of Minneapolis v. Fidelity National Title Insurance Co.*, 572 F.2d 155, 161 (8th Cir. 1978); *Foremost Construction Co. v. Killam*, 399 S.W.2d 593, 596 (Mo.App. 1966). The courts will not narrowly construe the terms of a policy so as to deprive the insured of the protection he reasonably expected and, where a claim is arguably within the policy's coverage, the insurer has the burden of proving that the claim is excluded from coverage. *First National Bank of Minneapolis v. Fidelity National Title Insurance Co.*, 572 F.2d at 161; *Ranger Insurance Co. v. Mercantile Trust Co.*, 363 F.Supp. 795, 800–01 (E.D.Mo.1973); *Foremost Construction Co. v. Killam*, 399 S.W.2d at 596.

 Turning now to the facts of this case, we observe that St. Paul's principal contention on appeal is that the liens here in dispute were created or suffered by CMIT. Specifically, St. Paul points out that it disbursed the loan proceeds only to proper claimants, that the loan default occurred because of a dispute between the borrower and the lender, that CMIT failed to take immediate action to foreclose after the default,[7] that the cost of the work performed was greater than the money actually made available to St. Paul to pay construction costs, that CMIT discontinued funding the development even though it had not disbursed the full amount of its loan commitment, and that if CMIT had disbursed the full amount of its loan these liens would not have been filed. Based on the foregoing, St. Paul submits that the mechanic's liens were created or suffered as a result of CMIT's conduct following the default.[8] Furthermore, since such liens are

5. Although the court denied plaintiff's claim for vexatious refusal, the court's award, $34,-459.83, included the costs and attorney's fees incurred by CMIT in negotiating a settlement of the mechanic's liens with the lienholders.

6. Title insurance, however, is more than simply "a contract of indemnity. Usually, the very purpose and essence of the title insurance transaction is to obtain a professional title search, opinion and guarantee. [Thus,] the policy of title insurance is in the nature of a warranty." *Lawyers Title Insurance Corp. v. Research Loan & Investment Corp.*, 361 F.2d 764, 767–68 (8th Cir. 1966). This is especially true in the construction financing situation. One of the principal reasons a construction lender purchases title insurance is to protect himself against statutory mechanic's liens, and he relies on the title insurer to keep him accu-

rately informed as to the state of the title record during the time he disburses his loan funds.

7. In passing, we note that there is no merit to St. Paul's contention that CMIT's failure to foreclose immediately upon the developer's default resulted in the liens being created or suffered. As the parties stipulated below, the liens in question represent work and material put into the development prior to July 30, 1974. Obviously, an immediate foreclosure on August 5, 1974 would not have prevented the liens from arising.

8. The cases discussing the applicability of the "created or suffered" exclusion generally have stated that the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured

expressly excluded from coverage under the terms of its insurance policy, St. Paul maintains that the district court erred in finding that St. Paul breached its policy. St. Paul reaches this conclusion primarily on the basis of the Tenth Circuit's recent opinion in *Bankers Trust Co. v. Transamerica Title Insurance Co.*, 594 F.2d 231 (10th Cir. 1979).

The facts of the *Bankers Trust* case are remarkably similar to those presented here. Bankers agreed to provide the construction financing for an apartment complex being developed by the Breaks Land Corporation. The parties entered into a loan agreement which initially required Bankers to advance $400,000 to pay off the balance of a loan used to acquire the development property. Their agreement further provided that Bankers would advance additional funds, up to the maximum amount committed, on a "percentage of construction completed" basis as work on the apartment complex progressed. Breaks secured the loan by executing and delivering to Bankers a first deed of trust on the project property and, following the common practice in construction financing arrangements, Bankers procured a title insurance policy from Transamerica insuring the priority of Bankers' deed of trust against any mechanic's liens which might arise. And, as in this case, Bankers and Transamerica also entered into a dis-bursement agreement whereby the insurance company assumed the responsibility for disbursing the loan funds to the various subcontractors and materialmen as construction progressed.[9]

Approximately fifteen months after the project commenced, and after Bankers had made advances totaling more than $1.7 million, construction was halted and Bankers declared the loan in default. The default came about as a result of a deficiency in the funds available to finance the development. Bankers' loan commitment was substantially less than 100% of the amount necessary to complete the entire project. Bankers and Breaks knew at the time they entered into their loan agreement that additional funds would be needed to insure completion of the project, and Breaks had agreed to obtain these funds from other sources. When these funds failed to materialize, and it became obvious that the money available for the project would be far short of that needed to complete construction, Bankers refused to advance any further funds even though it still had not paid out the full amount of its loan commitment. By the time Bankers declared the loan default, however, over $300,000 in mechanic's liens had been filed against the development property.[10] These liens were ultimately de-

---

or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved. The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss. *See, e. g., Arizona Title Insurance & Trust Co. v. Smith*, 21 Ariz.App. 371, 519 P.2d 860 (1974); *Foremost Construction Co. v. Killam*, 399 S.W.2d 593 (Mo.App.1966); *Laabs v. Chicago Title Insurance Co.*, 72 Wis.2d 503, 241 N.W.2d 434 (1976); *see generally* Annot. 87 A.L.R.3d 515 (1978).

9. Like St. Paul, Transamerica agreed to secure lien waivers from the proper claimants at the time disbursements were made and then issue an endorsement to its title insurance policy increasing the effective date and coverage of the policy.

10. These liens arose in part because, for reasons not fully explained, the loan agreement and the disbursement agreement each provided a different, and inconsistent, procedure for disbursing loan funds. Under the "percentage of construction completed" formula set forth in the construction loan agreement, the funds Bankers advanced Transamerica to pay construction costs were not predicated on the amounts actually due and owing to the individual subcontractors at the time specific draw requests were made. Rather, the percentage of funds advanced was directly proportional to the percentage of the total work completed on the project. Simply put, if ten percent of the total work on the development was completed, Bankers advanced ten percent of the total amount of its loan. Transamerica, however, acting in accordance with the disbursement agreement, disbursed funds on a different basis. In order to secure lien waivers, Transamerica disbursed funds based on the actual costs of construction as represented by the invoices submitted by the contractors and materialmen. Hence, as the court of appeals noted, since Bankers was not providing 100% of the financing for the development, the funds

termined to be valid and Bankers called upon Transamerica to discharge them pursuant to its title insurance policy. Transamerica refused, and Bankers filed suit in federal district court. The district court subsequently granted Transamerica's motion for summary judgment and on appeal the Tenth Circuit affirmed, holding that Transamerica was excused from discharging the liens because they had been created or suffered by the insured.

The court of appeals observed that there was no contention that Transamerica had misapplied or improperly disbursed the loan funds advanced to it by Bankers. Transamerica had obtained lien waivers from each claimant to whom funds were disbursed, and the liens in question arose simply because the cost of the work performed exceeded the money made available to pay construction costs. The court further noted that if Bankers had paid out the full amount of its loan commitment, there would have been more than enough funds to cover the construction costs represented by these mechanic's liens. More importantly, finding that the disbursement agreement entered into by Bankers and Transamerica "clearly contemplated that adequate funds were to be made available to Transamerica in order to satisfy claims," 594 F.2d at 233, the court ruled that Bankers' failure to provide such funding justified Transamerica's refusal to discharge the liens. The court stated that *"[w]here, as here, work was performed and payment was not made up to the amount of the lender's loan commitment, the resulting mechanic's liens must be considered to have been created or suffered by the insured claimant and such liens are expressly excluded by the language of the title policy."* Id. at 234 (emphasis original).

In the context of this case, we conclude that *Bankers Trust* constitutes persuasive authority for the result advocated by St. Paul.[11] As both parties concede, these liens did not arise because St. Paul improperly or erroneously disbursed loan funds. They came about as a result of the time lag in the draw request procedure used by the parties. Whenever a draw request was submitted, payment was requested for work and materials furnished as of a certain date. But a draw request would not be paid until it had been reviewed and approved by the general contractor, the supervising engineer and the developer, and several days would pass between the date of a draw request and the date funds were transferred to St. Paul for disbursement to the subcontractors and materialmen. And since work on the development continued during the interim period between a draw request and the disbursement date, additional debts were incurred which would not be encompassed by the draw request for which payment was made. Thus, when CMIT made its last disbursement to St. Paul on July 29, 1974, these funds were used to pay a draw request submitted on July 16, 1974. Work and material put into the development after July 16th, including the improvements attributable to the liens filed by Kienstra and S & S Utility, would have been included in a subsequent draw request. The parties had followed the same procedure in handling nine previous draw requests, and each time the title insurance policy had been advanced several days beyond the date of the draw request. This created no problems on those previous occasions because the liens which accumulated during the intervening period would be included in the next draw request and CMIT had always advanced the funds to pay those debts. However, following the developer's default in early August, 1974, CMIT, exercising its rights under the loan agreement

---

disbursed by Bankers pursuant to its loan agreement bore "no *real* relationship to the *actual* cost of construction." 594 F.2d at 236 (emphasis original).

**11.** In both this case and *Bankers Trust*, federal jurisdiction was based on diversity of citizenship. But whereas Missouri law controls dis-

position of this case, Colorado law supplied the appropriate substantive law in *Bankers Trust*. Nonetheless, we have no reservations about our reliance on *Bankers Trust* in reviewing this case since we believe that Missouri law and Colorado law on this subject are generally consistent.

with the developer, refused to advance additional funds for the project. Debts accruing between July 16th and July 29th went unpaid, causing mechanic's liens to arise.

While CMIT admittedly was under no obligation to continue funding the project after the default, it seems clear that the parties contemplated that CMIT would provide adequate funds to pay for work completed prior to the default. To hold otherwise would give the insured an unwarranted windfall and would place the title insurer in the untenable position of guaranteeing payment of work for which loan funds were never advanced. Under these circumstances, we find that any liens attributable to work performed between July 16th and July 29th were created or suffered as a result of CMIT's failure to furnish, as it had on nine previous occasions, the funds necessary to cover the costs of improvements made during this period. In view of the conduct of the parties in dealing with the liens that accumulated between the time of the draw request and the date that the policy of insurance was advanced, we hold that the liens which arose between July 16th and July 29th were created or suffered by CMIT and, since such liens were expressly excluded from coverage under St. Paul's policy, St. Paul did not breach its policy in refusing to defend or discharge these liens.

Accordingly, we vacate and reverse the judgment of the district court and remand with direction to enter judgment in behalf of the defendant/appellant, St. Paul Title Insurance Corporation.

ARNOLD, Circuit Judge, dissenting.

I respectfully dissent, substantially for the reasons given by Chief Judge Meredith in his opinion for the District Court, 478 F.Supp. 1041 (E.D.Mo.1979).