In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2785

BB SYNDICATION SERVICES, INC.,

*Plaintiff-Appellant,*

*v.*

FIRST AMERICAN TITLE
INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 10-cv-195-wmc — **William M. Conley**, *Chief Judge.*

ARGUED DECEMBER 11, 2013 — DECIDED MARCH 12, 2015

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge.* This case involves the most litigated provision in the standard-form title-insurance policy purchased by real-estate lenders to protect their security interests

in ongoing construction projects. The project at issue here—a large commercial development in Kansas City, Missouri—was aborted in the middle of construction due to cost overruns. When the developer would not cover the shortfall, the construction lender stopped releasing committed loan funds, and contractors filed liens against the property for their unpaid work on the unfinished project.

Bankruptcy followed, and the contractors' liens were given priority over the lender's security interest in the failed development, leaving little recovery for the lender. The lender looked to its title insurer for indemnification. The title policy generally covers lien defects, but it also contains a standard exclusion for liens "created, suffered, assumed or agreed to" by the insured lender. The question is whether this exclusion applies to the liens at issue here, which resulted from the lender's cutoff of loan funds. We hold that it does, and thus the title insurer owes no duty to indemnify.

### I. Background

We begin with some background on how title insurance functions in the construction context. Large construction projects are typically funded by a combination of cash from the developer and a construction loan. The loans are secured by the construction project itself—the land and building in progress. At the beginning, of course, the building has little value, but as it is built, its value increases. If the construction project fails and puts the developer into bankruptcy, the lender's loan is protected only by the unfinished project, which is often worth far less than the money put into it.

To protect against this risk, construction lenders structure their loans in two important ways. First, they require the developer to spend its cash investment before tapping any loan proceeds; this equity cushions the lender against losses if the project falls apart. After the developer's cash has been spent, the loan is disbursed in increments as work is completed and only in amounts necessary to fund the completed work (that is, to pay contractors, subcontractors, and so on). This second feature ensures that the lender's actual outlay (i.e., the principal balance of the loan) will slowly increase with the approximate value of its security interest.

To protect the priority of its security interest, the lender also purchases title insurance. Unique in the insurance world, title insurance differs from other forms of property and liability insurance in that it only covers losses from defects in title and lien priority (and similar title-related risks), usually requires only a one-time premium, and lasts for as long as the insured holds title (or, in this context, a security interest). *See Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391, 399–400 (7th Cir. 2014) (explaining the differences between title insurance and general liability insurance). This model works because title insurance is retrospective rather than prospective; it generally protects against defects in title that arose *prior to* the issuance of the policy, allowing the insurer to reduce or eliminate risk by conducting a careful title search to identify defects. These features, however, cause some complications in the construction-loan context.

Many states give unpaid contractors a mechanic's lien that is superior to all other security interests. Because title insurance

is retrospective, it generally doesn't protect a real-estate lender from liens arising *after* the issuance of the policy. If the lender wants this protection, it must contract with the title insurer for periodic updates or endorsements of the policy. Each time the policy is updated, the title insurer conducts a "date down" title search to check for new title defects. In addition, parties to construction projects often designate the lender's title insurer as the disbursement agent for the loan funds. When the developer submits a draw request as each phase of the project is completed, the lender releases loan funds to the title company, and the title company (acting as disbursement agent) verifies that the contractors are paid properly, obtains lien waivers, and updates the policy accordingly.

Especially in large construction projects, loan agreements commonly give the lender the right to stop disbursing loan funds if the loan becomes "out of balance"—that is, if revised cost estimates exceed the committed loan amount plus the cash the developer has invested. When the lender cuts off funding, there will always be some outstanding unpaid work; contractors request payment as work is completed, but there is inevitable delay from the time when work is completed to the time when bills are submitted. If the title insurer last updated the policy after the work was completed but before payment was requested or funds were cut off, an issue arises about whether the title policy covers the mechanics' liens filed by the unpaid contractors.

That's the question in this case. The standard-form title-insurance policy contains a provision known as Exclusion 3(a), which excludes coverage for liens that are "created, suffered,

assumed or agreed to" by the insured lender. The issue here is whether a construction lender "creates" or "suffers" a mechanic's lien by cutting off loan funds when a project collapses due to cost overruns, leaving some completed work unpaid. Several cases have addressed this issue (this contractual arrangement is widely used) but have come to different conclusions.

*        *        *

We now turn to the specific facts of this case. Trilogy Development Company, a real-estate developer, contracted with J.E. Dunn Construction Company, a general contractor, for construction of a mixed-use commercial development in Kansas City, Missouri, called "West Edge." The initial estimated cost was $118 million, and funding for the project would come from a $32 million investment by Trilogy—$12 million in land and another $20 million in cash—and a construction loan in the amount of $86 million from BB Syndication Services, Inc., a Wisconsin-based loan syndicator.[1] The loan was secured by the West Edge project, and BB Syndication obtained title insurance from First American Title Insurance Company, a California-based title insurer operating throughout the United States. The parties designated First American as the disbursement agent for the loan funds.

Early on there were indications that costs would exceed the initial estimate. The project had been "fast tracked," meaning that the contracts were signed and work started before the design was finalized. About a year and a half after construction

---

[1] We've rounded off all figures for ease of reference.

began, Dunn claimed that Trilogy's changes to the plans had increased the construction costs by $20 to $30 million. If Dunn's estimates were correct (as they later proved to be), the construction loan would have been out of balance soon after the project started, giving BB Syndication the right to cut off loan disbursements. But the lender chose to continue funding the project anyway. When the likely cost overruns first came to light, BB Syndication had disbursed only about $5 million of the $86 million loan commitment. By the time the project fell apart, BB Syndication had paid out more than $61 million.

The beginning of the end came about a year after Dunn first identified the probable cost overruns, when Trilogy failed to pay Dunn from the proceeds of a disbursement of loan funds.[2] Dunn stopped all construction, and multiple subcontractors filed liens against the project. Trilogy briefly hired a new contractor to try to salvage the project, but within a few months acknowledged that the development was now short by about $37 million. Trilogy did not supply additional cash to keep the project afloat and bring the loan into balance. At this point BB Syndication cut off funding and declared the loan in default, generating more liens for work performed during the short interim period. When BB Syndication called for repayment, Trilogy filed for bankruptcy protection.

In the bankruptcy Trilogy initiated an adversary proceeding to determine the amount and priority of liens and creditors.

---

[2] Trilogy later returned these funds to First American, and they were placed in an escrow account over which BB Syndication had control. BB Syndication ultimately released most, though not all, of them to pay the subcontractors directly.

In addition to the various subcontractor liens, Dunn had filed a $12 million lien for its unpaid work. Many of the liens were for work performed before First American's most recent update to the title policy, so BB Syndication looked to the insurer for a defense and indemnification in the adversary proceeding. Relying on Exclusion 3(a), First American rejected the tender, taking the position that BB Syndication had created the liens by cutting off loan funding.

The bankruptcy court eventually allowed $17 million in mechanics' liens, all of which were given priority over BB Syndication's security interest. A judicial auction of the unfinished project yielded only $10 million. All the creditors eventually settled, leaving BB Syndication with a paltry $150,000 on its $61 million claim.

While the bankruptcy proceedings were ongoing, BB Syndication sued First American in Wisconsin state court alleging breach of the title policy and bad-faith denial of coverage. First American removed the case to federal court. The district court delayed the proceedings until the relevant factual issues were determined by the bankruptcy court and then resolved the case on cross-motions for summary judgment. In a split ruling, the court held that First American violated its duty to defend BB Syndication but had no duty to indemnify because Exclusion 3(a) excluded coverage for the disputed liens. The latter determination was fatal to the bad-faith claim, so the court awarded BB Syndication its litigation costs in the adversary proceeding (as damages on the duty-to-defend claim) but otherwise entered judgment for First American.

BB Syndication appeals, challenging the district court's application of Exclusion 3(a) and also seeking to revive its bad-faith claim if the no-coverage determination is reversed. First American did not cross-appeal the adverse duty-to-defend ruling.

## II. Discussion

We review the district court's interpretation of the insurance policy and its resulting grant of summary judgment de novo. *Netherlands Ins. Co. v. Phusion Projects, Inc.*, 737 F.3d 1174, 1177 (7th Cir. 2013).

The parties first dispute whether Wisconsin or Missouri law controls. A federal court sitting in diversity applies the law of the state in which it sits, including the state's choice-of-law rules. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). "[U]nder Wisconsin's choice of law algorithm, if the laws of the competing states are the same, a court must apply Wisconsin law." *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 987 (7th Cir. 2005). Furthermore, choice-of-law decisions are "made on an issue-by-issue basis." *Beard v. J.I. Case Co.*, 823 F.2d 1095, 1099 (7th Cir. 1987); *State Farm Mut. Auto. Ins. Co. v. Gillette*, 641 N.W.2d 662, 682 (Wis. 2002).

The district court applied Wisconsin law to interpret the insurance contract and Missouri law to the other issues—namely, the bad-faith claim. Neither party has identified any relevant differences between Wisconsin and Missouri law on the interpretation and application of Exclusion 3(a). First

American refers us to an Eighth Circuit case applying Missouri law and addressing the precise issue in this case: *Brown v. St. Paul Title Insurance Corp.*, 634 F.2d 1103 (8th Cir. 1980). But a circuit court's interpretation of state law does not become the law of that state. *See United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994). And First American does not explain how Wisconsin law differs from *Brown*'s interpretation of Missouri law. Accordingly, like the district court, we apply Wisconsin law to the interpretation and application of the insurance contract. Because we conclude that the liens are not covered by the title policy, we do not need to address the bad-faith claim—either the choice-of-law issue or the merits.[3]

Under Wisconsin law "'[t]itle insurance policies are subject to the same rules of construction as are generally applicable to contracts of insurance.'" *First Am. Title Ins. Co. v. Dahlmann*, 715 N.W.2d 609, 616 (Wis. 2006) (quoting *Laabs v. Chi. Title Ins. Co.*, 241 N.W.2d 434, 438 (Wis. 1976)). To resolve coverage questions, Wisconsin courts "give effect to the intent of the contracting parties" and interpret the policy "as [it] would be understood by a reasonable person in the position of the insured." *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004). Wisconsin also adheres to the general rule that ambiguities in policy language—including ambiguities about the scope or effect of an exclusion—are construed

---

[3] Anyway, the parties agree that under both Wisconsin and Missouri law, a finding of coverage is a prerequisite to a bad-faith claim.

against the insurer.[4] *See, e.g.*, *Phillips v. Parmelee*, 840 N.W.2d

---

[4] There is reason to doubt the application of this rule of contract construction in this context. The Wisconsin Supreme Court has suggested various justifications for the rule, but all rely on the assumption that insurance policies are drafted by insurers. *See, e.g.*, *Folkman v. Quamme*, 665 N.W.2d 857, 865 (Wis. 2003) ("Insurers have the advantage over insureds because they draft the contracts. Thus, courts construe ambiguities in coverage in favor of the insureds and narrowly construe exclusions against insurers."); *Donaldson v. Urban Land Interests, Inc.*, 564 N.W.2d 728, 731 (Wis. 1997) ("As the drafter of the insurance policy, … the insurer is the party best situated to eliminate ambiguity in the policy … ."). In other words, this rule of insurance-policy interpretation is a specific application of the more general *contra proferentum* ("against the offeror") principle of contract interpretation. Wisconsin courts have recognized an exception for one form of insurance—bankers bonds—because the standard-form contract was a joint effort of insurers and the insured banking industry. *See Tri City Nat'l. Bank v. Fed. Ins. Co.*, 674 N.W.2d 617, 621–22 (Wis. Ct. App. 2003) ("[S]hould there be any ambiguity, the wording of fidelity bonds is not construed strictly against the drafter because the justification behind the rule—unequal bargaining power—has been eliminated." (citing *State Bank of Viroqua v. Capitol Indem. Corp.*, 214 N.W.2d 42, 43 n.1 (Wis. 1974) ("These bonds are not the usual contracts of adhesion and the familiar rule of interpreting a contract strictly against the insurer and liberally in favor of the insured should not apply."))).

The same is true of title insurance in the construction-loan context. The first standard-form policy—from which the more recent versions are derived—was drafted by *lenders*, and the construction-lending industry has since remained involved in the revision process. *See* Kenneth E. Dzien & Keith Jonathan Turner, *Not All Insurance Policies Are Adhesion Contracts: A Case Study of the ALTA Loan Title Policy*, 33 TORT & INS. L.J. 1123 (1998); Quintin Johnstone, *Title Insurance*, 66 YALE L.J. 492, 504–05 (1957); Christian Ness, Note, *Insurance—Judicial Construction of the Lender's Policy of Title Insurance*, 49 N.C. L. REV. 157, 160–62 (1970). To our knowledge, the

(continued...)

713, 716 (Wis. 2013) Still, "insurance policies, like other contracts, are to be read as a whole." *Blum v. 1st Auto & Cas. Ins. Co.*, 786 N.W.2d 78, 83–84 (Wis. 2010). "As a result, it may be necessary to look beyond a single clause or sentence to capture the essence of an insurance agreement, so that a policy is not made ambiguous by isolating a small part from the context of the whole." *Id.* (internal quotation marks omitted). Finally, insurance contracts should not be construed "to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium." *Am. Girl*, 673 N.W.2d at 73.

Provision 7(a) of the First American policy insures against losses incurred by reason of "any statutory lien for services, labor or material" having priority over the insured lender's mortgage and arising "from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy."[5]

Central here is Exclusion 3(a) of the policy, which excludes any liens that are "created, suffered, assumed or agreed to" by the insured. This exclusion is a standard feature in title policies,

---

[4] (...continued)

Wisconsin Supreme Court has on at least one occasion applied the *contra proferentum* rule of construction against a title insurer, *see First Am. Title Ins. Co. v. Dahlmann*, 715 N.W.2d 609, 620 (Wis. 2006), though never (as far as we are aware) to title insurance in the construction-lending context.

[5] Provision 7(b) of the policy covers some mechanics' liens arising *subsequent to* the date of the policy. We'll address the scope of that provision in a moment.

but it can't apply any time the construction lender could have prevented a mechanic's lien from arising. After all, the lender can always just pay the contractor's claim and eliminate the reason for the lien. But the exclusion must mean *something*, so most courts imply a fault requirement. *Laabs v. Chi. Title Ins. Co.*, 241 N.W.2d 434, 439 (Wis. 1976) (suggesting that the exclusion refers to "a conscious, deliberate causation or an affirmative act which actually results in the adverse claim or defect"); *see also Home Fed. Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 732–33 (7th Cir. 2012) ("[T]he clear majority view … is that [Exclusion 3(a)] applies only to intentional misconduct, breach of duty, or otherwise inequitable dealings by the insured.").

The liens at issue here relate to outstanding work that remained unpaid when BB Syndication cut off loan disbursements due to insufficient funds to complete the project. As such, the liens arose directly from BB Syndication's action as the insured lender, so coverage seems squarely foreclosed by Exclusion 3(a).

BB Syndication argues that it can't be at fault because it had a contractual right to stop disbursing loan funds if the loan became out of balance. That is undisputed, but not dispositive. The contractual provisions granting that right address BB Syndication's rights and duties vis-à-vis *Trilogy*, the developer; they do not address whether BB Syndication owed a duty to its title insurer to supply sufficient funds to cover outstanding unpaid work. Furthermore, if BB Syndication in some way *caused* the cost overrun, or had control over *when* the project was aborted, then it could be deemed at fault for any

resulting mechanics' liens. Either action could significantly affect the amount of outstanding unpaid work. Accordingly, resolving the fault question requires us to examine BB Syndication's responsibility to discover and prevent cost overruns.

Before doing so, however, we must resolve a side issue raised in the briefing. BB Syndication argues that First American agreed to cover liens arising from insufficient funds by promising not to invoke Exclusion 6, another standard-form exclusion. As an initial matter, First American has invoked Exclusion 3(a), not Exclusion 6, so this argument seems off point. But if Exclusion 6 directly addresses the liens at issue here, then First American should not be allowed to rely on a general exclusion after agreeing not to invoke a more specific one. That said, the argument fails because Exclusion 6 addresses an entirely different set of circumstances.

As we've explained, although title insurance generally covers only liens arising from work performed *prior to* the policy date, it sometimes also includes coverage for liens arising from work *subsequent to* the policy date. Provision 7(b) of the First American policy covers liens arising from subsequent work, but this coverage is limited to work that is "financed in whole or part by proceeds of the [loan] secured by the insured mortgage" and that the insured lender "has advanced or is obligated to advance."[6] Exclusion 6 is just the

---

[6] Provision 7 of the First American policy, which applies to mechanics' liens, covers:

(continued...)

other side of the same coin: It excludes liens arising from work performed subsequent to the policy date and *not* "financed in whole or in part by proceeds of the [loan] secured by the insured mortgage" and that the lender "has advanced or is obligated to advance."[7]

Note that Exclusion 6 appears to be redundant here since it excludes liens that are not affirmatively covered by Provision 7

---

[6] (...continued)

    7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:

    (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or

    (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance[.]

[7] The full text of Exclusion 6 is as follows:

    Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

of the policy. That's not entirely surprising. There are multiple versions of the standard-form title-insurance policy in use; some contain broader coverage grants than others. *See generally* 1 MICHAEL T. MADISON ET AL., LAW OF REAL ESTATE FINANCING § 6:19 (2001). Regardless of redundancy, the obvious purpose of Exclusion 6 is to exclude coverage for liens arising from future, unpaid work that is *unrelated* to the construction project the insured lender is financing. *Id.* In other words, Exclusion 6 does not address liens that arise when the insured lender cuts off loan funds; instead, it addressed liens from work financed by an entirely different *source* of funds.

Indeed, BB Syndication expressed a similar understanding of Exclusion 6 in an email to First American:

> Can exclusion 6 of the policy be modified[?] Currently limits protection over mechanics liens financed in whole [or] in part by the loan proceeds. Substantial equity funds will be contributed to this project. Can the protection extend to those as well?

Rather than modify Exclusion 6, First American simply agreed not to invoke it. By doing so, First American did not agree, even implicitly, to cover liens arising from insufficient funds to complete the project. First American's agreement not to invoke Exclusion 6 may not have affected the scope of coverage at all (since the exclusion was probably unnecessary here), but at most it expanded lien coverage to work on the project that was financed by different (i.e., nonloan) sources—in particular, the equity funds invested by Trilogy.

All the disputed liens in this case relate to work that was financed by BB Syndication's loan and went unpaid when it shut off the funding spigot. First American's agreement not to invoke Exclusion 6 is simply irrelevant to the coverage question here.

We are left then to consider the whole of the contractual arrangement to determine whether the lender or the title insurer bore the risk of liens arising from the cessation of loan funds due to cost overruns. We are not the first appellate court to consider this question. Five cases—including one from this circuit—have addressed the application of Exclusion 3(a) in this situation: *See Bankers Trust Co. v. Transamerica Title Insurance Co.*, 594 F.2d 231 (10th Cir. 1979); *Brown v. St. Paul Title Insurance Corp.*, 634 F.2d 1103 (8th Cir. 1980); *American Savings & Loan Ass'n v. Lawyers Title Insurance Co.*, 793 F.2d 780 (6th Cir. 1986); *Chicago Title Insurance Co. v. Resolution Trust Corp.*, 53 F.3d 899 (8th Cir. 1995); and *Home Federal Savings Bank v. Ticor Title Insurance Co.*, 695 F.3d 725 (7th Cir. 2012). Unfortunately, the cases do not point in the same direction.

The Eighth and Tenth Circuits have squarely held that when a construction lender cuts off funding in this situation, it "creates" or "suffers" any liens that arise from insufficient funds, triggering the application of Exclusion 3(a). *See Brown*, 634 F.2d at 1110; *Bankers Trust*, 594 F.2d at 234–35. This is so, those courts held, even though the insured lender had a contractual right to cut off loan funding. *See Brown*, 634 F.2d at 1110 ("While [the lender] admittedly was under no obligation to continue funding the project after the default, it seems clear that the parties contemplated that [the lender] would provide

adequate funds to pay for work completed prior to the default."). Both courts reasoned that insufficient construction funding isn't the type of risk that title insurance is built to bear. *Bankers Trust*, 594 F.2d at 234 ("In effect, it is claimed that by the issuance of a title insurance policy, [the insurer] became a guarantor of payment for all work actually performed. That is more than the insurance contract calls for."); *Brown*, 634 F.2d at 1110 ("To hold otherwise would give the insured [lender] an unwarranted windfall and would place the title insurer in the untenable position of guaranteeing payment of work for which loan funds were never advanced.").

Three subsequent cases, however, distinguished *Brown* and *Bankers Trust* and reached the opposite result. In *American Savings* the Sixth Circuit began by endorsing the reasoning and result in *Brown* and *Bankers Trust*, explaining that had those cases come out differently, "the [title] insurer would have been in the unenviable position of insuring against events over which the insured [lender] had responsibility and control." *Am. Sav.*, 793 F.2d at 786. But the court thought its case was different because the lender had fully disbursed its initial loan commitment:

> [A]llowing [the lender] to recover from its in-surer would not make [the title insurer] the guarantor of work for which loan funds were committed but never advanced, but rather, the guarantor of work for which loan funds were never committed. The insurer would not be insuring against events that the insured could and was obligated to prevent, but would be

> insuring against events that were beyond the
> control of the insured and that lay within the
> control of the developer.

*Id.*

The Eighth Circuit engaged in similar reasoning in *Chicago Title*. 53 F.3d at 905–07. There, the court relied on the fact that the insured lender—"[u]nlike the lenders in *Bankers Trust* and *Brown*"—had "advanced its full loan commitment, just as the insured did in *American Savings*." *Id.* Both *American Savings* and *Chicago Title* held that the insured lender cannot be said to have "created" or "suffered" liens that arise from insufficient project funds once the lender has released all the loan funds it initially committed.

BB Syndication relies heavily on *American Savings* and *Chicago Title*, arguing that it too disbursed the full amount of its initial loan commitment. It points out that under section 2.2 of the construction loan agreement, the loan was limited to the lesser of: $86 million, or 80% of the appraised value of the property, or 75% of the total costs of the project. BB Syndication had disbursed $61 million when it cut off funding, $25 million short of its $86 million total loan commitment. BB Syndication argues, however, that the $61 million represented more than 80% of the appraised value of the property, fulfilling its loan commitment.

This argument lacks a factual foundation. BB Syndication did not supply evidence to support its claim about the appraised value of the property. Indeed, the district court rejected this argument precisely because no appraisal had ever been

done. So even if we agreed with the line drawn in *American Savings* and *Chicago Title*, BB Syndication would lose.

Taking another tack, BB Syndication insists that this case is closer to *American Savings* and *Chicago Title* than to *Brown* and *Bankers Trust* for a different reason. In *Brown* and *Bankers Trust*, the lenders cut off funding shortly after it became clear that project costs would exceed the project budgets. *See Brown*, 634 F.2d at 1106; *Bankers Trust*, 594 F.2d at 235–37. In *American Savings* and *Chicago Title*, on the other hand, the lender continued to supply loan funds despite indications that the project was underfunded. *See Am. Sav.*, 793 F.2d at 781 (noting that the lower court found that the lender knew the project might be underfunded); *Chi. Title*, 53 F.3d at 902 ("Within several months the project began to experience cost over-runs."). The insured lender in *Chicago Title* even went beyond its initial commitment. 53 F.3d at 908 ("[The lender] not only funded the full loan amount, but furnished additional funds. It also sought more funding from the developer and gave up interest payments. It did what it could to minimize the risk of liens under the circumstances it faced.").

Similarly here, BB Syndication continued to fund the West Edge project long after the writing was on the wall. It was clear early on in the life of the project that cost overruns would put the loan out of balance. At that time BB Syndication had only disbursed $5 million in loan funding, yet it kept the spigot open, ultimately releasing more than $61 million in loan funds before declaring the project unfinishable and halting the flow of money. BB Syndication insists that its forbearance demonstrates good faith—a willingness to do everything possible to

see the project through—so the fault for the liens cannot be laid at its feet. Perhaps. An alternative interpretation is that its poor business judgment precipitated the liens.

Either way, BB Syndication's argument exposes a flaw in the reasoning of *American Savings* and *Chicago Title.* Contrary to the assumption underlying those decisions, construction lenders have significant ability to ensure that the projects they finance remain economically viable—both at the beginning when deciding whether to finance a project and how much money to commit, and also throughout construction. The contractual arrangements in this case are commonplace and demonstrate the lender's broad authority. As a condition to closing, BB Syndication required Trilogy to submit, for its approval, various documents that would allow it to assess the project's viability before closing the loan: e.g., financial statements (both Trilogy's and its owner's); an appraisal of the anticipated value of the completed project; the construction plans; the construction contract between Trilogy and Dunn, the general contractor; Dunn's financial information; and a list of Dunn's previously completed projects. (Although the parties' agreement required these disclosures, we do not know whether these conditions were satisfied or waived prior to closing.)

The loan agreement also allowed BB Syndication to monitor the project throughout construction to ensure its continued viability. It could request financial reports from Trilogy and conduct monthly on-site inspections of the project. If at any point BB Syndication determined that the loan was out of

balance, it could require Trilogy to supply a cash infusion.[8] If the developer's available funds were insufficient to complete the project, BB Syndication could choose to cut off disbursements—*or not*. BB Syndication had the discretion to continue funding even a doomed project.[9] *See Chi. Title*, 53 F.3d at 902

---

[8] Section 18.1 of the construction loan agreement provides:

> 18.1 <u>Additional Deposits</u>: In the event that during the development of the Project … Lender should determine, *in Lender's reasonable discretion*, that the balance of the costs of construction of the Project, together with all related costs and expenses, are likely to be greater than the undisbursed portion of the funds made available under this Agreement, … Borrower will, immediately upon receipt of written demand from Lender, deposit with Lender such amounts as Lender requires in order to assure that Lender may at all times have in its possession sufficient monies and undisbursed funds to pay the total estimated unpaid balance of the costs of construction and all related costs and expenses. *Lender's reasonable estimate of any such required deposit … shall be binding on Borrower*. (Emphases added.)

[9] Section 8 of the disbursement agreement provides, in part:

> 8. <u>Construction Loan Balance</u>. If at any time during the course of construction, Lender notifies the Disbursing Agent that the total of unpaid disclosed construction costs … exceeds the amount of the undisbursed Construction Loan proceeds, the Disbursing Agent shall not make further disbursements of Funds … . *Notwithstanding the above, the Disbursing Agent shall make any disbursement if specifically directed in writing to do so by Lender*. (Emphasis added.)

(noting that the lender "had a right … to halt construction … but it did not exercise it").

In short, at the first sign of trouble, BB Syndication could have used the threat of default to force the developer to supply additional funds. If Trilogy was unwilling or unable to do so, BB Syndication's losses would have been less than $5 million—and most likely zero—since the land alone was worth roughly $12 million. Instead, BB Syndication chose to continue funding the project. That was its prerogative, of course, but in the end this risky business decision resulted in $17 million in liens from unpaid work.

BB Syndication now looks to First American to cushion its losses, but this stretches title insurance too far. Finding coverage in this situation—where the insured lender has the sole discretion to either continue or cease funding a project that is or has become unfinishable—would raise a serious question of moral hazard. Most work on a construction project increases its value (and in turn the value of the lender's security interest), but if the title company has to cover the costs while the lender retains the benefit, then the lender obtains a windfall by shifting a *business* risk to the title insurer. *See Brown*, 634 F.2d at 1110. Since the amount of unpaid work will depend on the timing of a doomed project's inevitable termination, lenders might strategically delay. That is exactly the type of problem that Exclusion 3(a) is there to prevent.

The line drawn in *American Savings* and *Chicago Title*—that Exclusion 3(a) does not apply if the insured lender has disbursed all of its loan proceeds—does not grapple with this hazard. Knowing that unpaid contractors' claims will be

covered by title insurance once the loan proceeds run out may in some circumstances encourage lenders to continue to fund a project even after it becomes clear that it has no chance of succeeding.

A better interpretation is that Exclusion 3(a) excludes coverage for liens that arise as a result of insufficient funds. This interpretation makes the most sense of the respective roles of the insured lender and the title insurer in this context. Only the lender has the ability—and thus duty—to investigate and monitor the construction project's economic viability. When liens arise from insufficient funds, the insured lender has "created" them by failing to discover and prevent cost overruns—either at the beginning of the project or later. This interpretation also has the advantage of being a clear rule that parties can bargain around.

This understanding of Exclusion 3(a) does not "effectively nullify the mechanic's lien coverage," as the court in *Chicago Title* feared. 53 F.3d at 907. Title insurers remain "obliged to protect against the possibility of [lenders] paying twice for the same work." *Bankers Trust*, 594 F.2d at 234. The construction lender's title policy insures against failures in the *payment process*, not the business risks associated with project failure due to insufficient funds. For example, if "the developer had absconded with the loan funds," *Am. Sav.*, 793 F.2d at 783, then the title insurer would be on the hook for the resulting mechanics' liens. To take a more pedestrian example: If the developer or general contractor "improperly or erroneously disburse[s] loan funds," *Brown*, 634 F.2d at 1109, the title policy would cover the resulting liens. Indeed, it is for this very

reason that sophisticated parties to construction projects designate the title insurer to act as the disbursing agent for the loan funds. In this role the insurer is better able to control the payment process and guard against the insured risk.

Protecting construction lenders against the risk of cost overruns is the job of other insurance products and financial instruments. Performance bonds, for example, require the bonding company to complete a project if the contractor defaults. *See generally* 1 MICHAEL T. MADISON, supra, § 6:24 (2001). Or, as BB Syndication did here, construction lenders can insist on a guarantee from a third party (in this case Trilogy's owner). That's not to say that title insurance can never be used to guarantee unfunded work; but the standard-form title policy is not meant to cover this type of risk, so lenders need to explicitly contract for this protection. One way to do so is to purchase the so-called "Seattle Endorsement"—basically, a promise from the title company not to invoke Exclusion 3(a) for liens arising from insufficient funds. *See id.* § 6:19.

This brings us to the last case in the list mentioned above: *Home Federal*, a decision from this circuit. There, we noted that the distinguishing feature in both *Brown* and *Bankers Trust* was that the title insurer also acted as a disbursing agent. *Home Fed.*, 695 F.3d at 733–35. In that case a construction lender cut off loan funding after the developer defaulted, leaving a $6 million lien for unpaid work from the general contractor. When the lender brought a foreclosure action, the contractor counterclaimed, asserting that its lien had priority. The lender tendered the defense to its title insurer, but the insurer rejected the tender for two reasons: first, the contractor's claim of priority

was nearly frivolous because "Indiana … gives priority to a commercial construction mortgage over all later-recorded mechanic's liens," *id.* at 731; and second, Exclusion 3(a) precluded coverage. The lender thereafter settled the claim by agreeing to pay the contractor $1.8 million, then sued the title insurer for breach of its duty to defend and indemnify. Relying on *Brown* and *Bankers Trust*, the district court entered summary judgment for the insurer, but we reversed.

Our analysis in *Home Federal* rested largely on the premise that the duty to defend is broader than the duty to indemnify. Because "the duty to defend depends on what the claimant alleges, not the ultimate merit or lack of merit of the claim," *id.*, the title insurer could not rely on the argument that the lien didn't have priority over the mortgage under Indiana law. "[The contractor's] claim might have been weak, even hopeless, but that lack of merit could not absolve [the title insurer] of its duty to defend against the attempted enforcement of a mechanic's lien with priority over the mortgage." *Id.* And in Indiana "[a]n insurer that refuses to defend its insured … is … bound by the result of litigation," including reasonable settlements. *Id.* at 736 (internal quotation marks omitted). Therefore, once a breach of the duty to defend was established, the title insurer was "precluded from arguing that it was under no duty to indemnify [the lender]," *id.* at 735, and thus was required to cover the $1.8 million settlement.

We also noted, however, that if the policy contained an exclusion "that would have applied even if the underlying claim had been valid," the insurer may properly refuse to defend. *Id.* at 732 (citing *Cincinnati Ins. Co. v. Mallon*, 409 N.E.2d

1100, 1105 (Ind. Ct. App. 1991)). This prompted an analysis of Exclusion 3(a). Reviewing the facts of *Brown* and *Bankers Trust*, we reasoned that the outcome in those cases rested on the existence of a disbursement agreement between the title insurer and lender: "[T]hese cases involved breaches of a duty because the insured banks had each *agreed* to make adequate funds available to pay the developers and their contractors." *Id.* at 734. The title insurer in *Home Federal*, on the other hand, was not the designated disbursing agent. Because "there was no disbursement agreement, the lender had no obligation to continue lending good money after bad." *Id.* at 734–35. On this reasoning, we held that the lender did not "create" or "suffer" liens by cutting off funding, and Exclusion 3(a) did not apply. *Id.*

*Home Federal* supports our conclusion here because First American was, in fact, the disbursing agent for the loan funds in this construction project.[10] But *Home Federal* may have relied too heavily on the existence of a disbursement agreement. First, the presence of a disbursement agreement doesn't fully explain the results in *Brown* and *Bankers Trust*. True, the

---

[10] BB Syndication disagrees, arguing that as in *Home Federal*, it was not "bound to disburse the entirety of its loan commitment to [the developer] even if [the developer] was in default." *Home Fed. Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 734–35 (7th Cir. 2012). But that was also true in *Brown*, and *Home Federal* acknowledged that *Brown* was rightly decided. *Id.* at 733–35; *Brown v. St. Paul Title Ins. Corp.*, 634 F.2d 1103, 1110 (8th Cir. 1980) (noting that the "[lender] admittedly was under no obligation to continue funding the project after the default"). However, BB Syndication's argument underscores the flaw in making the presence of a disbursement agreement dispositive, as we explain in the text.

contractual arrangement in those cases, as here, required the insured lender to supply the title company with funds to cover the draw requests from the developer.[11] But a duty to provide sufficient funds when a project is going well doesn't necessarily translate into a duty to continue to provide funds when the project has fallen apart. The contracts in those cases, as here, also gave the lenders the right to cut off funding if the project became out of balance. *Brown*, 634 F.2d at 1110.

It's true that both courts noted the presence of a disbursement agreement, and *Bankers Trust* even called it "critical." *Bankers Trust*, 594 F.2d at 233; *Brown*, 634 F.2d at 1109–10. In the end, however, the decisions relied more heavily on the fact that title insurance isn't built to cover this sort of risk. As the Tenth Circuit explained, "[i]n effect, it is claimed that by the issuance of a title insurance policy, [the insurer] became a guarantor of payment for all work actually performed. That is more than the insurance contract calls for." *Bankers Trust*, 594 F.2d at 234; *see also Brown*, 634 F.2d at 1110 ("To hold otherwise would give the insured [lender] an unwarranted windfall and would place the

---

[11] Section 3 of the disbursement agreement provides:

> 3. <u>Conditions Precedent to Each Disbursement</u>. Prior to each disbursement of Funds under this Agreement, it is a requirement of this Agreement that the Disbursing Agent … be furnished:
>
> …
>
> d. Sufficient funds to cover the requested advance.
>
> … .

title insurer in the untenable position of guaranteeing payment of work for which loan funds were never advanced.").

More fundamentally, placing decisive weight on the existence of a disbursement agreement produces anomalous results. Under *Home Federal* a title insurer that also acts as a disbursing agent would not have to cover liens arising from insufficient funds, whereas a title insurer (using the same standard-form policy) that does *not* act as a disbursing agent *would* have to cover them. The nondisbursing title insurer would thus be assuming a *greater* risk. But if a title company is both title insurer *and* disbursing agent, then it has *more* control over whether mechanics' liens will arise because it can ensure that loan funds are disbursed to the right people and in the proper amounts.[12]

That's not to say that *Home Federal* was wrongly decided. To the contrary, the panel relied on another important factor— namely, that Indiana "gives priority to a commercial construction mortgage over all later-recorded mechanic's liens." 695 F.3d at 731. It would have been strange indeed to require the lender to pay off a lien that *didn't have priority* just so its title

---

[12] Some have suggested that when the title company also acts as disbursing agent, the scope of coverage is broader. *See* Michael F. Jones & Rebecca R. Messall, *Mechanic's Lien Title Insurance Coverage for Construction Projects: Lenders and Insurers Beware*, 16 REAL EST. L.J. 291, 305 (1988) ("[T]he scope of the coverage will be greatest where the loan is disbursed by the title company rather than by the lender. In point of fact, the authors submit that this has been recognized by sophisticated lenders and the title companies used by them for years, and that many such lenders have long opted for having the title company disburse for this reason … .").

insurer would defend the priority of its mortgage. The lack of priority of the contractor's lien over the mortgage obviated the lender's implied duty to its title insurer to release sufficient funds to prevent that lien from arising. *See id.* at 734 ("[The lender] owed no duty to [its title insurer] to disburse the entire amount of the loan commitment to [the general contractor] to pay its contractors. Because of the Indiana statute giving strong priority to the construction lender's mortgage, it should have taken little trouble or expense for [the title insurer] to honor the promise of its mechanic's lien endorsement by defending against the [contractor's] counterclaim.").

In the end, this case is closer to *Brown* and *Bankers Trust* than to *Home Federal*. The liens at issue here arose from insufficient project funds, a risk of loss that BB Syndication— not First American—had the authority and responsibility to discover, monitor, and prevent. Accordingly, BB Syndication can be said to have "created" or "suffered" the resulting liens. Exclusion 3(a) applies, and the liens are not within the scope of the title policy.

AFFIRMED.