IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**FIDELITY NATIONAL TITLE INSURANCE COMPANY,**
*Intervenor/Appellant/Cross-Appellee,*

*v.*

**OSBORN III PARTNERS LLC, ET AL.**
*Defendants/Appellees/Cross-Appellants.*

---

No. CV-21-0086-PR
Filed March 1, 2023

---

Appeal from the Superior Court in Maricopa County
Nos. CV2008-033080, CV2009-002138, CV2009-002641, CV2009-003123,
CV2009-019132, CV2009-050918, CV2011-001213
CONSOLIDATED
The Honorable Randall H. Warner, Judge
The Honorable Michael J. Herrod, Judge
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division One
250 Ariz. 615 (App. 2021)
**VACATED IN PART**

---

COUNSEL:

Robert R. Berk, Charles M. Callahan, Jones, Skelton & Hochuli, P.L.C.,
Phoenix; and David M. Satnick (argued), Helen Gavaris, Loeb & Loeb LLP,
New York, NY, Attorneys for Fidelity National Title Insurance Company

Richard M. Lorenzen (argued), Paul F. Eckstein, Joel W. Nomkin, Perkins
Coie LLP, Phoenix, Attorneys for Osborn III Partners LLC, et al.

Ari Ramras, Ramras Legal PLC, Phoenix, Attorney for Amicus Curiae Land
Title Association of Arizona

————————

JUSTICE LOPEZ authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, JUSTICES BOLICK, BEENE, MONTGOMERY, and KING joined.

————————

JUSTICE LOPEZ, Opinion of the Court:

¶1 We consider the meaning and application of Exclusion 3(a) — a standard title insurance policy exclusion designed to cover any defects, encumbrances, or adverse claims "created" or "suffered" by the insured — in the context of construction lending. We hold that this Court's opinion in *First American Title Insurance Co. v. Action Acquisitions, LLC*, 218 Ariz. 394 (2008), sets forth the proper interpretation and application of this standard policy exclusion. The *Action Acquisitions* framework is a causation inquiry to determine whose conduct *actually* caused the defect, encumbrance, or adverse claim.

## BACKGROUND

¶2 On April 24, 2006, Osborn III Partners, LLC (the "Developer") hired Summit Builders ("Summit") to be its general contractor on a condominium project. On August 14, 2006, the Developer entered into a loan agreement (the "Agreement") with Mortgages Ltd. ("ML") to secure financing for the project's construction. Pursuant to the terms of the Agreement, ML agreed to lend the Developer $41.4 million, which was to be secured by a deed of trust on the property.

¶3 To ensure the priority and validity of the deed of trust, ML purchased a title insurance policy from the predecessor to Fidelity National Title Insurance Company ("Fidelity"). The title insurance policy explicitly protected the priority of ML's deed of trust against mechanics' liens arising from work related to the land that commenced before the policy date. This protection was subject to the policy's Exclusion 3(a), which "expressly excluded from coverage" any "[d]efects, liens, encumbrances, adverse claims or other matters . . . created, suffered, assumed or agreed to by the insured claimant."

¶4            Problems arose over the course of the project, including delays and the Developer's inability to make interest payments.   On March 24, 2008, the Developer and ML jointly agreed to transfer $414,119.06 from a construction impound account to make the March 2008 interest payment due under the Agreement.   Notwithstanding these funding concerns, the project advanced. On May 16, 2008, ML approved $175,619.28 in construction costs payable to Summit.  Four days later, the Developer authorized another transfer of $439,315.08—this one from another ML-financed project's account—to cover the May 2008 interest payment due under the Agreement.

¶5            By June 6, 2008, Summit had completed its portion of the construction work authorized by the Developer.   On June 24, 2008, ML provided the Developer notice that it had not received the interest payment due on June 17, 2008, which was a default under the Agreement's terms. Although the record does not establish the precise order of events, ML contemporaneously ceased funding for the project, withholding approximately $1.1 million of its original loan commitment, and the Developer failed to pay Summit for its completed work.  On July 3, 2008, Summit filed its notice and claim of mechanics' liens, attempting to recover compensation for the work it completed on the project.   Although the parties dispute the amount, Summit claimed that, as of July 3, the principal amount owed for its completed work was $2,044,250.70.

¶6            Also, in mid-2008, ML entered bankruptcy proceedings.  Due to the bankruptcy, ML's interest in the project's promissory note and deed of trust was transferred to a group of successors, which included newly created Osborn III Loan LLC and several fractional interest holders (collectively, "Osborn").  In connection with the bankruptcy reorganization, the bankruptcy court also created ML Manager to manage the overall restructuring of ML.  For purposes of this appeal, Osborn stands in ML's shoes, as insureds, with respect to the title insurance policy and is subject to any defenses that Fidelity may raise under the policy, including a defense under Exclusion 3(a).

¶7            On December 30, 2008, Summit sued to enforce its mechanics' liens, which had priority over ML's deed of trust.  *See* A.R.S. § 33-992 (providing that mechanics' liens relate back to the date when work began on a project).  After three years of litigation, ML Manager settled with Summit to finally resolve the lien foreclosure action, ultimately agreeing to pay Summit $1,750,000.  Osborn then sought to recover that amount from

Fidelity under the title insurance policy. Fidelity denied Osborn's claim, arguing that Exclusion 3(a) applied to bar coverage for costs associated with Summit's mechanics' liens.

¶8 On February 19, 2016, the trial court issued the first of two rulings concerning Exclusion 3(a). In its first ruling, the court invoked *Action Acquisitions* to interpret Exclusion 3(a), explaining that the relevant inquiry was whether ML's actions "caused" (i.e., created) Summit's mechanics' liens. The court noted that it was "not easy to articulate [a] standard for deciding" whether an insured party has "created" a lien in the "construction context" because the cases addressing this issue "are not consistent."

¶9 Due to the divergent jurisprudence on the issue, the court elected to formulate its own principle, relying primarily on *Home Federal Savings Bank v. Ticor Title Insurance Co.*, 695 F.3d 725 (7th Cir. 2012). The court reasoned that coverage under the title insurance policy should not require that an insured waive a contractual right—here, the discretion to withhold funding under the Agreement in the event of default. Consequently, if an insured acts within its contractual rights, as a matter of law, such action cannot be said to have "created" the lien for purposes of Exclusion 3(a). The court ruled that, "as a matter of law[,] ML did not create Summit's mechanics' liens" because ML was within its contractual rights to withhold the remaining funds committed under the Agreement.

¶10 Fidelity moved to reconsider this ruling, contending that ML did not act within its rights under the Agreement. On October 4, 2016, the trial court issued its second ruling, which largely mirrored its first by employing the *Ticor* approach. After addressing many of the evidentiary deficiencies in the case, the court ruled that Fidelity had failed to prove that ML exceeded its contractual rights when it withheld the final $1.1 million in funding. The trial court entered a final judgment in favor of Osborn, awarding the amount paid to Summit ($1,750,000), plus attorney fees and costs. Fidelity appealed.

¶11 The court of appeals reversed the trial court's judgment, rejecting its reliance on *Ticor*. *Fid. Nat'l Title Ins. Co. v. Osborn III Partners LLC*, 250 Ariz. 615, 628 ¶ 59 (App. 2021). Instead, the court applied the bright-line rule articulated in *BB Syndication Services, Inc. v. First American Title Insurance Co.*, 780 F.3d 825 (7th Cir. 2015). *See Osborn III Partners*, 250 Ariz. at 626 ¶ 52. The *BB Syndication* rule holds that "when a construction

lender cuts off funding, Exclusion 3(a) excludes coverage for liens that arise when completed work goes unpaid as a result of a funding shortfall." *Id.* In other words, if a construction lender withholds funding, that lender "create[s]," as a matter of law, any liens that may result from funding deficiencies. *Id.* at 628 ¶ 58. Thus, under *BB Syndication*, as a matter of law, ML "created" Summit's mechanics' liens by withholding the remaining funds committed under the Agreement despite its contractual right to do so. *Id.* Consequently, Exclusion 3(a) excluded Osborn's coverage under the title insurance policy. *Id.* ¶ 59.

¶12 We granted review to consider the meaning and application of this standard policy exclusion in the construction lending context, a recurring issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶13 The parties dispute Exclusion 3(a)'s meaning and application. This exclusion is recognized as "the most litigated provision in the standard-form title-insurance policy purchased by real-estate lenders to protect their security interests in ongoing construction projects." *BB Syndication,* 780 F.3d at 826. Our task is to resolve this interpretive dispute and clarify when the exclusion applies.

¶14 "[W]e review de novo the meaning of insurance policies," *Teufel v. Am. Fam. Mut. Ins. Co.*, 244 Ariz. 383, 385 ¶ 10 (2018), and "defer to the trial court's findings of fact unless they are clearly erroneous," *Shooter v. Farmer*, 235 Ariz. 199, 200 ¶ 4 (2014). "We accord words used in [insurance] policies their plain and ordinary meaning, examining the policy 'from the viewpoint of an individual untrained in law or business.'" *Walker v. Auto-Owners Ins. Co.*, 254 Ariz. 17, 20 ¶ 10 (2022) (alteration in original) (quoting *Teufel*, 244 Ariz. at 385 ¶ 10). Additionally, "the insurer bears the burden [of] establish[ing] the applicability of any [policy] exclusion." *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46 ¶ 13 (App. 2000).

## I.

¶15 We first consider Exclusion 3(a)'s meaning in the construction lending context.

5

**A.**

¶16        Fidelity's title insurance policy Exclusion 3(a) bars coverage for losses or damages arising out of any "[d]efects, liens, encumbrances, adverse claims, or other matters: [] created, suffered, assumed, or agreed to by the insured claimant."  This exclusion,  standard in most title insurance policies, is colloquially "described as excluding matters that are the insured's 'own darn fault.'"   1 Joyce Palomar, *Title Insurance Law* § 6:10 (2022 ed.).   To determine whether Summit's mechanics' liens are ML's "own darn fault," we must delineate the parameters of Exclusion 3(a) to identify insureds' conduct that triggers the exclusion.

¶17        We do not begin our inquiry on a blank slate.  We have previously interpreted a similar exclusion in *Action Acquisitions*, 218 Ariz. at 400 ¶ 28, albeit in the context of a homeowner's title insurance claim, *id.* at 396 ¶ 2.  There, the plaintiff-purchasers procured a home worth $300,000 to $400,000 at a foreclosure sale based on a $3,500 bid.  *Id.*  After the sale, the plaintiff-purchasers obtained a homeowner's title insurance policy to insure against losses related to the purchase of the home.  *Id.* ¶ 3.  Notably, the policy excluded coverage for certain losses, including those "resulting from risks 'created, allowed, or agreed to by' the insureds."  *Id.* at 399 ¶ 25. Following the policy's issuance, the previous homeowners successfully set aside the sale based upon the grossly inadequate price the plaintiff-purchasers paid.  *Id.* at 397 ¶ 4.  Rather than contesting the trial court's judgment setting aside the sale, the plaintiff-purchasers filed a claim under their title insurance policy.  *Id.*  The insurer denied the claim, asserting that the plaintiff-purchasers' actions squarely implicated "the 'created' risk exclusion."   *Id.*   The parties litigated the exclusion's applicability, culminating in this Court's review.

¶18        We first explained that in order to properly "resolve this [dispute], we [had to] consider the scope of the policy exclusion[] . . . for risks 'created' by the insured."  *Id.* ¶ 7.  With respect to scope, we noted that "Arizona's court of appeals and courts across the country have held that an insured creates a defect or a risk by acting affirmatively to bring it about." *Id.* at 400 ¶ 26.   We next contemplated courts' disparate approaches concerning "the intent required to trigger" this standard policy exclusion. *Id.* ¶ 27.   Finally, after "[c]onsidering the nature of title insurance, we conclude[d] that the exclusion [was] *not* ambiguous and that it applie[d] whenever the insured intended the act causing the defect, not only when the insured intended the defect or when the insured engaged in

misconduct." *Id.* ¶ 28 (emphasis added). Applying this standard, we concluded that the plaintiff-purchasers had "created the risk that resulted in the loss" by bidding $3,500 for a home worth one hundred times the amount of the bid. *Id.* ¶ 29. We noted the clear line of causation—"[t]heir bid was an intentional, affirmative act that resulted in the sale being set aside," which, in turn, allowed the plaintiff-purchasers to make a claim under their title insurance policy. *Id.* Because the plaintiff-purchasers' intentional act caused the coverage-triggering event—the setting aside of the sale—their actions fell within the "created" risk exclusion. *Id.* We accordingly held that the insurer properly denied the plaintiff-purchasers' claim under the exclusion. *Id.* ¶ 30.

**B.**

¶19          *Action Acquisitions*' interpretation of this standard policy exclusion controls our interpretation and application of Exclusion 3(a) in the construction context. There, we held that the coverage exclusion for risks "created, allowed, or agreed to by the insureds" was *unambiguous* because it was subject to only *one* reasonable interpretation. *Id.* at 399 ¶ 25, 400 ¶ 28; *see also Teufel*, 244 Ariz. at 385 ¶ 10 ("If a policy is subject to 'conflicting reasonable interpretations,' it is ambiguous . . . ." (quoting *State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 258 (1989))). Because Exclusion 3(a), which excludes coverage for risks "created, suffered, assumed, or agreed to by the insured claimant," does not materially differ from the exclusion in *Action Acquisitions*, we conclude that Exclusion 3(a) is also unambiguous.

¶20          We therefore interpret Exclusion 3(a) according to its terms' ordinary meaning. *See Wilson*, 162 Ariz. at 257 ("If . . . the court finds the clause unambiguous, it construes it 'according to its ordinary meaning' . . . ." (quoting *State Farm Mut. Ins. Co. v. Wilson*, 162 Ariz. 247, 248 (App. 1989))). The plain meaning of "create" is "[t]o bring into being," or "to cause to exist," *Create*, Black's Law Dictionary (6th ed. 1990), whereas the plain meaning of "suffer" is "[t]o allow or permit," *Suffer*, Black's Law Dictionary (11th ed. 2019). Fidelity argues that ML's withholding of the remaining funds committed under the Agreement (i.e., the remaining $1.1 million) triggers Exclusion 3(a) because this act either "created" or "suffered" Summit's mechanics' liens.[1] In this context, "create," simply

---

[1] Because the meaning of "suffer" entails affirmative assent, which Fidelity does not allege, our analysis necessarily focuses on whether ML's actions "created" Summit's mechanics' liens.

means to *cause*. The question therefore is whether ML's actions caused Summit's mechanics' liens—precisely the inquiry we established in *Action Acquisitions* when we held that the "created" risk exclusion "applie[d] whenever the insured intended the act *causing* the defect," irrespective of the insured's misconduct or intent that the defect occur. *Action Acquisitions*, 218 Ariz. at 400 ¶ 28. Thus, Exclusion 3(a) will only apply if ML's actions caused Summit's mechanics' liens.

## C.

**¶21**        Having adopted *Action Acquisitions*' causation test for Exclusion 3(a)'s applicability, and before we apply it to the facts in this case, we pause briefly to explain our rejection of the competing alternative federal court approaches embraced by the trial court, the court of appeals, and the parties.

**¶22**        The trial court's conception of the purpose of construction lending title insurance underlies its decision to adopt the *Ticor* approach that a lender does not create a mechanics' lien as a matter of law if it exercised its contractual right to withhold funding. *See Ticor Title Ins.*, 695 F.3d at 735. The trial court reasoned that title insurance principally insures against two risks in this context: (1) the "backward-looking" risk that mechanics' liens for work completed before issuance of an insurance policy would hold higher priority than the construction lender's deed of trust; and (2) the "forward-looking" risk that myriad issues with the construction project may result in mechanics' liens. Thus, Exclusion 3(a) operates to limit the insurer's liability for both prior and prospective risks if the insured is at fault. The trial court noted, however, that a mechanics' lien could arise under the prospective risk category for reasons beyond the insured's control; for example, if a mechanics' lien results from a developer's project mismanagement, or if a contractor causes cost overruns resulting in nonpayment to its subcontractors or withholds payment due to a subcontractor's shoddy work. The court also noted that Exclusion 3(a) did not clearly communicate to the lender that it must forego its contractual remedies to maintain its lien priority. *See Roberts v. State Farm Fire & Cas. Co.*, 146 Ariz. 284, 286 (1985) ("[I]f an insurer wishes to limit its liability, it must employ language in the policy which clearly and distinctly communicates to the insured the nature of the limitation.").

**¶23**        We reject the *Ticor* approach, as did the court of appeals, because it conflicts with *Action Acquisitions* by effectively requiring an insured's contractual breach—a form of misconduct—to trigger the

exclusion. We held in *Action Acquisitions* that an insured's "misconduct" is not a prerequisite to applying the "created" risk exclusion. 218 Ariz. at 400 ¶ 28. Consequently, whether an insured acts within its contractual rights to "create" the mechanics' liens is irrelevant because *Action Acquisitions* asks only whether the insured's actions *actually* caused the liens. Moreover, the *Ticor* approach undermines the title insurance industry by incentivizing lenders to trigger title insurance coverage by creating mechanics' liens through the exercise of contractual rights.

¶24 The court of appeals relied on *BB Syndication* to effectively hold that a construction lender who withholds funding necessarily causes *any* liens that arise after such action despite the reason for the insufficiency. *See Osborn III Partners*, 250 Ariz. at 626 ¶ 52; *see also BB Syndication*, 780 F.3d at 836. The court reasoned that this approach furnished coverage for mechanics' liens while giving effect to Exclusion 3(a), tracked the respective responsibilities of construction lenders and insurers, provided a clear rule that contracting parties could bargain around, *Osborn III Partners*, 250 Ariz. at 626 ¶ 52, and properly curtailed the scope of coverage because "insufficient construction funding [was not] the type of risk that title insurance [was] built to bear," *id.* ¶ 53 (quoting *BB Syndication*, 780 F.3d at 833). Thus, *BB Syndication* properly allocated the burden of mechanics' liens arising from insufficient funding to the lender—the party presumably better situated to mitigate risks associated with funding shortfalls and to potentially forestall funding issues. *Id.* at 626–27 ¶¶ 54–55, 628 ¶ 58.

¶25 We reject the *BB Syndication* approach because it does not sufficiently accord with *Action Acquisitions*' causation analysis, undermines the purpose of construction lending title insurance by limiting coverage for mechanics' liens, and disincentivizes lenders' rational economic decisions. First, *Action Acquisitions* and the plain language of Exclusion 3(a) focus on *the insured*'s acts that caused the liens (or other defects). The policy, properly construed, protects the insured from the actions of third parties and excludes coverage only when the insured is actually at fault. Second, although the court of appeals deemed curtailment of coverage based on insufficient funding justifiable in light of the lender's and developer's respective roles, this gives short shrift to the parties' contractual rights embodied in title insurance. As the trial court noted, a lender obtains title insurance to guard against mechanics' liens that result from construction project issues, whatever their nature, caused by other parties. Finally, *BB Syndication* incentivizes lenders to jettison rational analysis of the financial status of a project; instead, lenders are pressured to terminate

projects at the first sign of financial difficulty or fund projects beyond their existing loan commitments to avoid mechanics' liens.

¶26 We note that *BB Syndication* and *Action Acquisitions* announce similar rules focused on causation. But *BB Syndication*, as construed and applied by the court of appeals in this case, too readily infers causation from withholding of funding and subsequent mechanics' liens. In so doing, its reasoning arguably conflates causation with correlation and ignores other contemporaneous acts unrelated to the withholding of funding that may be the actual cause of nonpayment of contractors. *Action Acquisitions* provides a truer path to ensuring that Exclusion 3(a) applies only if the insurer proves that a lender's withholding of funding *actually* caused the mechanics' liens.

## II.

¶27 *Action Acquisitions*' causation framework is a fact-intensive analysis akin to causation in tort law. *See, e.g.*, *Torres v. Jai Dining Servs. (Phx.) Inc.*, 252 Ariz. 28, 31 ¶ 12 (2021) (stating an act is the "proximate cause" of an event if it occurs "in a natural and continuous sequence, unbroken by any efficient intervening cause" (quoting *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546 (1990))). Under this approach, the insurer bears the burden of demonstrating that the *insured's* actions caused the relevant, exclusion-triggering event. *See Hudnell v. Allstate Ins. Co.*, 190 Ariz. 52, 54 (App. 1997) ("[T]he insurer has the burden of proving that a policy exclusion is applicable.").

¶28 This title insurance coverage dispute spans a decade. Despite years of litigation, there remain at least three factual issues that must be resolved before Exclusion 3(a)'s applicability can be determined under *Action Acquisitions*' causation framework. First, on the record before us, as illustrated by the parties' conflicting interpretations of the record at oral argument, we cannot determine whether the Developer failed to pay Summit *because* ML withheld remaining funding, or whether the Developer's failure to pay Summit *preceded* ML's withholding of funds. Second, whether the work Summit performed that resulted in mechanics' liens occurred before or after ML withheld funds, at least in part, and whether ML notified Summit that funding would cease, remain unresolved. Third, the precise sum owed Summit for its mechanics' liens remains in dispute. Specifically, Osborn argues that Fidelity's contention that ML caused Summit's mechanics' liens by withholding funds is incorrect because the amount owed on Summit's mechanics' liens (approximately

$2 million) vastly exceeds the $1.1 million ML withheld. Although Fidelity contests Osborn's calculations, we do not have sufficient evidence before us to resolve this and other factual disputes. The trial court must undertake the necessary factfinding.

### III.

**¶29** Osborn and Fidelity have each requested attorney fees. We decline to award attorney fees to either party without prejudice to requesting such fees at the conclusion of the case.

### CONCLUSION

**¶30** For the reasons set forth above, we vacate paragraphs 48–59 of the court of appeals' opinion, and reverse and remand to the trial court to resolve relevant factual disputes and apply *Action Acquisitions'* causation framework consistent with this Opinion.